**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EUTELSAT S.A., | **)** | |
| | **)** | |
| Plaintiff, | **)** | Case No. 1:22-cv-04788 |
| | **)** | |
| v. | **)** | |
| | **)** | |
| INTELSAT INFLIGHT LLC (F/K/A | **)** | |
| GOGO LLC), | **)** | |
| | **)** | |
| Defendant. | **)** | |

## COMPLAINT

Plaintiff Eutelsat S.A. ("**Eutelsat**") brings this Complaint against Defendant Intelsat Inflight LLC (f/k/a Gogo LLC) ("**Defendant**" and, together with Eutelsat, the "**Parties**") seeking damages for anticipatory breach of contract or, in the alternative, promissory estoppel or breach of the obligation to negotiate in good faith. In support of this action, Eutelsat states and alleges as follows:

## I.   PRELIMINARY STATEMENT

1.      On or about September 26, 2019, after several months of negotiation, Eutelsat and Defendant entered into a Service Order for Satellite Capacity on E10B (the "**Service Order**"), a true and correct copy of which is attached hereto as **<u>Exhibit A</u>**, pursuant to which they agreed that Eutelsat would provide, and Defendant would purchase, capacity on a new all-electric satellite to be commissioned by Eutelsat.

2.      The contract's duration was seven years with a three-year ramp up in volume; the services to be rendered included the provision of satellite capacity on the to-be-commissioned satellite; and the pricing and fee structure included an annual service fee (obligating Defendant to pay $150 million in total over the seven-year period)—all of which were clearly set forth in the

contract.  The Service Order further provided that its terms were "binding between the parties" and was initialed and signed by the Parties' representatives.

3.      In reliance upon this binding contract, in or around late October 2019 Eutelsat signed a letter of agreement with Thales Alenia Space ("**Thales**") for the procurement of the new satellite, Eutelsat 10B ("**E10B**").  Its expected in-service date was April 2023.

4.      Following the signing of the Service Order, on October 29, 2019, Defendant issued a press release announcing its "multi-year agreement" with Eutelsat and that it would meet significant inflight connectivity demand through its "deal with Eutelsat." *See* Press Release, Gogo, "Gogo Meets Significant Inflight Connectivity Demand through Deal with Eutelsat" (Oct. 29, 2019) (the "**Press Release**") at 1, a true and correct copy of which is attached hereto as **Exhibit B**.

5.      A week later, on November 7, 2019, Defendant held an earnings conference call in which its president and CEO Oakleigh Thorne stated that Defendant had "commit[ed] to . . . EUTELSAT 10B"—a commitment "which [had been announced]" the week before. *See* Thomson Reuters Edited Transcript of Q3 2019 Gogo Inc. Earnings Call (Nov. 7, 2019) (the "**Earnings Call Transcript**") at 12, a true and correct copy of which is attached hereto as **Exhibit C.**

6.      On or about August 31, 2020, Defendant was purchased by bankrupt satellite-services company Intelsat S.A. ("**Intelsat**"), which operates a fleet of more than fifty satellites. The sale transaction closed on December 1, 2020.  According to Intelsat's public filings, the transaction was intended to "further propel[] the Company's efforts in the growing commercial [inflight connectivity] market, pairing [its] high-capacity global satellite and ground network with [Defendant's] installed base of more than 3,000 commercial aircraft to redefine the connectivity

experience."[1]  On information and belief, Intelsat planned for Defendant to purchase capacity on Intelsat's own satellites.

7.      Shortly after the sale transaction closed, on or about January 19, 2021, Defendant wrote to Eutelsat and stated, among other things, that "we do not intend to pursue a definitive agreement for capacity on E10B as described in the" Service Order the Parties had negotiated and executed.  Defendant's communication constituted a clear and unequivocal manifestation of its intention not to perform its obligations under the Service Order.  Although Eutelsat has worked diligently and in good faith to mitigate the losses resulting from Defendant's repudiation of its obligations under the Service Order, it has been unable to sell the capacity that Defendant agreed to purchase on E10B, which is set to launch in the fourth quarter of 2022.

8.      As a result of Defendant's repudiation of the Service Order, Eutelsat has suffered at least $150 million in damages.

## II.     THE PARTIES

### A.     Eutelsat

9.      Eutelsat is a *société anonyme* governed by its articles of association and the provisions of Book II of the French Commercial Code.  Eutelsat's headquarters and principal place of business are in Issy-les-Moulineaux, France.  It maintains regional offices in the United States in Washington, D.C. and Miami, Florida.  The purpose of the organization, in France and abroad, is to supply Space Segment capacity and satellite communications systems and services.  (The term "Space Segment" refers to a set of telecommunications satellites, and the tracking, telemetry, command, control, monitoring and related facilities and equipment necessary for the operation of

---

[1]  Intelsat S.A. Form 10-Q for the quarterly period ended March 31, 2021 ("**Intelsat 10-Q**") at 34, available at https://investors.intelsat.com/static-files/387c4b46-9265-4510-904b-4ce26b59c8e0.

those satellites.)  To that end, Eutelsat undertakes activities relating to the design, development, construction, installation, operation, and maintenance of its Space Segment and of those satellite systems and services.

**B.     Defendant**

10.     Defendant is a limited liability company organized and existing under the laws of the State of Delaware that maintains an established place of business at 111 North Canal Street, Chicago, Illinois 60606.  Until August 31, 2020, Gogo Inc. was Defendant's corporate parent.  On or about December 1, 2020, Defendant became an indirect wholly-owned subsidiary of Intelsat pursuant to the Purchase and Sale Agreement, dated as of August 31, 2020, by and between Intelsat Jackson Holdings S.A. and Gogo Inc. (the "**Sale Transaction**").[2]  Defendant can be served through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

**III.     JURISDICTION AND VENUE**

**A.     Jurisdiction**

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367 because Eutelsat is a citizen of France; Defendant is a citizen of Illinois; and the amount in controversy exceeds $75,000.

12.     This Court has general personal jurisdiction over Defendant because Defendant maintains an established place of business at 111 North Canal Street, Chicago, Illinois 60606, which is located within the Northern District of Illinois.

---

[2] *See Purchase and Sale Agreement*, dated as of August 31, 2020, by and between Intelsat Jackson Holdings S.A. and Gogo Inc. (the "**PSA**"), available at https://www.sec.gov/Archives/edgar/data/1525773/000119312520236642/d67300dex21.htm.

### B.     Venue

13.     Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. §§ 1391(b-d) because, *inter alia*, Defendant resides in, and is subject to personal jurisdiction in, this District at the time Eutelsat commenced this action and because Defendant's contacts within this District are significant and sufficient to subject it to personal jurisdiction.  Further, venue is appropriate in this District because a substantial part of the events or omissions giving rise to Eutelsat's claim occurred in this District.

## IV.     FACTS APPLICABLE TO ALL CLAIMS

### A.     Eutelsat

14.     In 1977, seventeen European countries formed the European Telecommunications Satellite Organization ("**EUTELSAT IGO**").  This intergovernmental organization established the first telecommunications satellite system in Europe.  Its central purpose was to design, develop, construct, operate, and maintain the Space Segment for international public telecommunications services in Europe.  It launched its first two satellites in 1983 and 1984 and then began providing Space Segment capacity for basic telecommunications and audiovisual services to Europe.  It later expanded its activities to the provision of a broad range of television and radio broadcasting services, business telecommunications services, and multimedia communications services to Europe, the Middle East, Africa, Asia, and the American continent.

15.     Following the liberalization of the telecommunications sector in the early 2000s, EUTELSAT IGO transferred all of its assets and operations to Eutelsat—a private company established for the purpose—on or about July 2, 2001.  Eutelsat's activities diversified rapidly in the 2000s to include internet and government services.  For example, at around the time of the commencement of the Iraq War in early 2003, Eutelsat established an American subsidiary (Eutelsat America Corp.) based in Washington, D.C. in order to provide critical services to the

United States government.  By the end of 2010, Eutelsat had opened offices in several European cities as well as in Asia and the Americas.  The company also augmented teleports in France and Italy to provide broadcast and broadband services in their respective regions.

16.     Today, Eutelsat offers capacity on thirty-six satellites that provide coverage over Europe, Africa, the Middle East, Asia, and the Americas and is one of the world's largest commercial satellite operators.  On July 26, 2022, Eutelsat announced a ground-breaking merger with OneWeb Ltd. ("**OneWeb**").  The new company will combine the proficiencies of Eutelsat's geostationary earth-orbit satellites with OneWeb's low-orbit satellites to offer rapid connectivity to customers.

**B.     Defendant**

17.     At the time of the Sale Transaction, Defendant had served the aviation industry for nearly thirty years and was the only provider in its industry that was focused exclusively on inflight connectivity and entertainment.[3]  Defendant's customers were airlines in the commercial aviation market and aircraft owners/operators in the business aviation market.[4]

18.     Defendant had two reporting segments in the commercial aviation market: Commercial Aviation North America ("**CA-NA**") and Commercial Aviation Rest of World ("**CA-ROW**") and one business aviation market reporting segment, Business Aviation ("**BA**").[5] Through CA-NA, Defendant offered satellite connectivity and entertainment services to commercial aircraft flying routes generally within North America.[6]  Through CA-ROW, Defendant offered satellite connectivity and entertainment services to commercial aircraft flying

---

[3]  Gogo Inc. Form 10-K for the fiscal year ended December 31, 2019, available at https://sec.report/Document/0001193125-20-072797/.

[4] *Id.*

[5] *Id.*

[6] *Id.*

routes outside of North America.[7]  Through BA, Defendant offered integrated equipment, network, and Internet connectivity products and services to the business aviation market.[8]

19.     In order to offer these satellite connectivity and entertainment services, Defendant had to purchase capacity on satellites operated by satellite-services companies like Eutelsat or Intelsat.  Specifically, Defendant's global "Ku-band satellite network" comprised thirty-four satellites operated by SES, Intelsat, and other providers, including Eutelsat.  The capacity, speed, coverage, and reliability of this network depended upon incorporating new satellites, including high throughput satellites ("**HTS**") like E10B.  Defendant also focused on incorporating new satellite technologies into its business model, such as low-earth orbit and mid-earth orbit satellites.[9]

**C.     The Parties' Negotiations and the Service Order**

20.     In or around mid-2019, Eutelsat and Defendant began negotiating the terms of the Service Order, pursuant to which Defendant would purchase HTS capacity on E10B.  At the time, Defendant had been a long-standing partner of Eutelsat and had purchased capacity on approximately three of Eutelsat's satellites.  For example, on November 15, 2015, Defendant entered into a Master Satellite Services Agreement (the "**MSA**," a true and correct copy of which is attached hereto as **Exhibit D**) with Eutelsat subsidiary Satélites Mexicanos, S.A. de C.V. ("**Satmex**").[10]  Under the MSA, Satmex, through its satellite fleet, would provide, as requested by Defendant or its affiliates, various satellite capacity services.  *See* Ex. D (MSA) § 1.

21.     During the Service Order negotiations, Defendant made clear what its objectives were for the new satellite, and the Parties' engineering teams discussed and engaged in frequent

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] Eutelsat completed its acquisition of Satmex on or about January 2, 2014.

correspondence concerning the specifications that would allow Defendant to achieve those objectives, including with respect to the location of satellite gateways, satellite beam coverage patterns, and link budgets.[11]

22.     On or about September 26, 2019, Defendant and Eutelsat entered into the Service Order.  The Service Order is a concrete expression of the essential terms of the Parties' agreement and manifests a clear intent to be bound by the agreement.

### 1.     The Service Order Is A Concrete Expression of the Essential Terms of the Parties' Agreement

23.     The Service Order is sufficiently definite to be enforceable because the Court can, from the contract's terms and provisions, ascertain what the Parties agreed to do and require those things to be done.

24.     Specifically, the Service Order provides that its "duration" is "7 years from satellite OSD [Operational Service Date] with 3-year ramp-up in volume" and that the satellite's "Expected In Service Date" is April 2023.  *See* Ex. A (Service Order).

25.     The Service Order provides the total capacity, with respect to both HTS and Global Spots, that Defendant agreed to purchase over a seven-year period.  *See id.*

26.     The Service Order provides the price per month that Defendant agreed to pay in exchange for that capacity over a seven-year period.  *See id.*

27.     And the Service Order provides the annual service fee (the product of capacity, price per capacity per month, and twelve months) that Defendant agreed to pay in exchange for that capacity over a seven-year period.  *See id.*

28.     Finally, the Service Order sets forth several other terms relating to Eutelsat's

---

[11] A link budget is an account of the various power gains and losses between a transmitter and a receiver in a telecommunication system.  It is the main basis to establish between the Parties future link performance and associated parameters, including terminal requirements and beam performance.

provision, and Defendant's purchase, of satellite capacity, including with respect to gateway fees, portability between satellites, portability of global spots, and interim satellite capacity. *See id.*

29.     Accordingly, the essential terms of the Service Order—duration, services to be rendered, and pricing/fees—are sufficiently definite that the Court can ascertain what the Parties agreed to do—i.e., Eutelsat to provide and Defendant to purchase satellite capacity for a period of seven years—and, thus, enforce their promises.

30.     Although the Service Order also provides that "[o]ther terms (incl. [Service Level Agreements ("**SLA**")], service credit, restoration, etc.) shall be further negotiated between the parties," *see id.*, these "other terms" were intended to cover non-material items, which would be memorialized in a separate agreement. The Parties made their intent with respect to these "other," non-material terms clear by, among other things, expressly providing that the "[t]erms in this [Service Order] are binding between the parties." *See id.*

### 2.     The Service Order Manifests a Clear Intent To Be Bound by the Parties' Agreement

31.     The Service Order also demonstrates a meeting of the minds or mutual assent to the terms of the contract.

32.     The Service Order expressly provides that its terms "are binding between the parties" and is initialed and signed by the Parties' representatives. *See id.*

33.     The Service Order provides that Board approval is a condition precedent to performance, *see id.*, and the Parties did, ultimately, obtain the requisite Board approvals.

34.     Specifically, on October 2, 2019 Defendant's Senior Director for Satellite Engineering emailed Eutelsat: "We have received Board approval for the E10X *agreement* we signed last week" (emphasis added).

35.     And, on October 7, 2019, Eutelsat's Board of Directors approved the procurement

of the E10B satellite.

36.     Eutelsat would only procure the E10B satellite if it entered into a binding agreement with Defendant for the purchase of capacity on the satellite.  Accordingly, Eutelsat postponed related discussions with its own Board of Directors until after the Parties executed the Service Order and the Service Order was approved by Defendant's Board of Directors.  Indeed, during the Parties' negotiations, Eutelsat made clear to Defendant that it would need a binding commitment from Defendant before approaching its Board of Directors about the procurement of E10B.

**3.      The Parties' Public Statements Manifest a Clear Intent To Be Bound by the Parties' Agreement**

37.     On or about October 29, 2019, Defendant announced its entry into the Service Order—what Defendant itself referred to as "a new satellite capacity *agreement* for high-speed inflight connectivity services."  *See* Ex. B (Press Release) at 1 (emphasis added).  According to Defendant, "Gogo has leased HTS bandwidth on [the E10B] satellite, to be leveraged over Europe and the Middle East."  *See id.*

38.     Gogo's then president and CEO Oakleigh Thorne, who initialed and signed the Service Order, stated: "We are advancing capacity capabilities given the growing demand for high-speed inflight connectivity services."  *See id.*  He continued: "Through our *partnership* with Eutelsat, Gogo 2Ku will continue to enable the best passenger experience for global airlines."  *See id.* (emphasis added).

39.     Eutelsat's then Chief Commercial Officer Philippe Oliva stated: "We are thrilled about our ongoing relationship with Gogo, a long-standing partner and a leading provider for inflight connectivity."  *See id.* at 2.  He continued: "This *agreement* highlights the relevance of our newly ordered Eutelsat 10B for inflight connectivity and we look forward to supporting Gogo as they increase capacity in Europe and the Middle East to provide the best services to their airline

partners." *See id.* (emphasis added).

40.　　On or about November 7, 2019, Defendant held a conference call to discuss its financial results for the third quarter of 2019.　*See* Ex. C (Earnings Call Transcript) at 2.　During the call, a research analyst for Roth Capital Partners remarked that Defendant had been "working hard to go back, renegotiate, expand the footprint to give [Defendant] some diversity and reliability and backup in terms of satellite failures."　*Id.* at 12.　The analyst then asked "how some of [Defendant's] contract renegotiations get feathered into [Defendant's] Satcom costs, particularly on the international front, where utilization is a lot lower, just given the number of aircraft that are currently live."　*Id.* at 12.　Thorne responded:

> Well, let's start with the renewals.　I mean, when we're renewing now, first of all, we're not . . . renewing on the same satellite.　***We're committing to a new satellite, like we did with EUTELSAT 10B, which was announced, I think, last week***.　And those new satellites are at a much lower unit cost than the contracts that are rolling off, dramatically lower.　So those are improving our economics in Rest of World.　And that's going to be one of the major drivers towards profitability in that division.

*Id.* (emphasis added).　Later in the call, Defendant's CFO Barry Rowan reiterated: "you also saw the announcement that we made about EUTELSAT for capacity over that region.　So that also helps as current contracts come off and we're able to deploy that 10B satellite at attractive pricing."　*Id.*

## D.　The E10B Satellite

41.　　In or around October 2019, in reliance upon the terms of the Service Order, Eutelsat signed a letter of agreement with Thales for the procurement of E10B[12] and directed Thales to build the satellite to specifications that would allow Gogo to achieve its objectives discussed during negotiations.

---

[12] *See* Press Release, Thales, "Thales Alenia Space to Build Eutelsat 10B Satellite for Inflight and Maritime Connectivity Services" (Oct. 29, 2019), available at https://www.thalesgroup.com/en/worldwide/space/press_Release/thales-alenia-space-build-eutelsat-10b-satellite-inflight-and.

42.     The E10B satellite was based on the Spacebus NEO Thales Alenia Space product line and would address HTS missions over Europe, the Mediterranean basin, and the Middle East, as well as over the Atlantic Ocean, Africa, and the Indian Ocean.[13]  E10B would be located at 10°E for a lifespan of at least fifteen years.[14]

43.     Two of E10B's payloads (i.e., modules carried on the satellite with the ability to perform certain functionalities) would provide timely continuity of services on Eutelsat 10A.[15] The HTS missions would allow Eutelsat to deliver high capacity Ku Band mobility services in the aviation and maritime sectors.[16]  The missions would be supported by a digital 14kW multi-beam digital payload allowing dynamic service allocation, essential to provide extensive flexibility and strength in the face of potential market changes.[17]

44.     E10B's HTS connectivity was conceived of and developed in close collaboration with Defendant in order to satisfy Defendant's specific needs.  Indeed, as further set forth below, *see infra* at ¶¶ 49-54, Eutelsat worked jointly with Defendant on a spot-by-spot basis, using and applying the specific technical data provided by Defendant and defining the payload frequency plan on the basis thereof.

45.     As Eutelsat's Director of Fleet and Capacity Planning stated in a March 2020 email to Gogo's Senior Manager of Satellite Network Engineering: "[T]he E10B satellite has been ordered as per the signed Service Order, but it has also been designed and optimized considering the capacity request shared by Gogo in our previous exchanges[.]"

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

### E.    Intelsat and Its Chapter 11 Cases

46.    Intelsat operates one of the world's largest satellite services businesses and provides communications services to media companies, fixed and wireless telecommunications operators, data networking service providers, multinational corporations, and Internet Service Providers.[18] Intelsat is also the leading provider of commercial satellite communication services to the U.S. government and other military organizations and their contractors.[19]   Generally, Intelsat's customers need the specialized connectivity that satellites provide to pursue their mission.[20]   In recent years, mobility services providers have contracted for services on Intelsat's fleet of satellites that support broadband connections for passengers on commercial flights, cruise ships and commercial shipping, connectivity that in some cases is only available through a satellite network.[21]

47.    On May 13, 2020, Intelsat and certain of its subsidiaries commenced voluntary cases (the "**Chapter 11 Cases**") under title 11 of the United States Code in the United States District Court for the Eastern District of Virginia (the "**Bankruptcy Court**").[22]   According to Intelsat's public filings, the "[p]rimary factors causing [Intelsat] to file for Chapter 11 protection included the Company's intention to participate in the accelerated clearing process of C-band spectrum set forth in the U.S. [FCC's] March 3, 2020 final order . . . , requiring the Company to incur significant costs related to clearing activities well in advance of receiving reimbursement for such costs and the need for additional financing to fund the C-band clearing process, service [its] current debt obligations, and meet [its] operating requirements, as well as the economic slowdown

---

[18] Intelsat 10-Q at 33.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

impacting the Company and several of its end markets due to the [COVID-19] pandemic."[23]

48.    On August 31, 2020, following approval from the Bankruptcy Court, Intelsat Jackson Holdings S.A. (a subsidiary of Intelsat) and Gogo Inc. entered into the PSA under which Intelsat Jackson Holdings S.A. purchased Defendant for $400 million in cash.[24]  Again, according to Intelsat's public filings, the transaction was intended to "further propel[] [Intelsat's] efforts in the growing commercial IFC market, pairing [its] high-capacity global satellite and ground network with Gogo's installed base of more than 3,000 commercial aircraft to redefine the connectivity experience."[25]  The Sale Transaction closed on December 1, 2020.[26]  Upon closing, Defendant became an indirect wholly-owned subsidiary of Intelsat.[27]

**F.    The Parties' Discussions Following Execution of the Service Order**

49.    After the Parties executed the Service Order on or about September 26, 2019, they engaged in discussion and correspondence to begin implementing the terms of the Service Order, including with respect to management of E10B's bandwidth and power resources and traffic density management.  On October 2, 2019, for example, the Parties held a meeting in Chicago, Illinois to discuss these subjects, among others, and to exchange Eutelsat's first draft of the E10B technical annex for Defendant's review.  Minutes of that meeting indicate that the meeting was intended to "follow-up the agreed key commercial terms for capacity on E10[B] as well as other topics," "including respective temporary capacity to ramp-up in the coming 3 years for . . . E10[B]."  At the close of the meeting, the Parties agreed upon a series of "next practical steps," including an exchange of data between the Parties and planned quarterly meetings.

---

[23] *Id.*

[24] *Id.* at 34.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 15.

50.     After the October 2019 meeting in Chicago, the Parties' engineering teams continued to engage in discussion and correspondence concerning E10B's performance and capabilities. Additionally, the Parties' commercial teams began to discuss the non-material terms that would take shape in a separate contract between the Parties.

51.     On November 20, 2019, Eutelsat's Deputy General Counsel transmitted a draft framework agreement to Defendant's Senior Vice President and Assistant General Counsel (the "**Draft Framework Agreement**," a true and correct copy of which is attached hereto as **Exhibit E**). The Draft Framework Agreement references the Service Order and incorporates by reference the terms and conditions of the MSA. *See* Ex. E (Draft Framework Agreement) at Recitals and §§ 1.2, 1.3(a). The MSA sets forth various non-material terms, including but not limited to terms relating to use restrictions, technical escalation, conditions for use, interruption of services, intellectual property, termination, force majeure, notices, licenses, confidentiality, privacy, assignment, representations and warranties, and governing law and jurisdiction. *See generally* Ex. D (MSA). The Draft Framework Agreement was intended to amend certain non-material provisions of the MSA (which, again, Defendant had already agreed to and executed), including terms relating to service charges (which would be as defined in the Service Order), effective date and duration, personal data, and governing law and jurisdiction. *See* Ex. E (Draft Framework Agreement) §§ 1.3(a)-(d).

52.     On or about January 23, 2020, the Parties finalized and signed the E10B satellite specification. Eutelsat began working to update the E10B technical annex accordingly. On February 26, 2020, Eutelsat transmitted the updated technical annex to Defendant. The updated technical annex was based on the Parties' previous discussions and described in greater detail the satellite's performance, including additional information related to the global spots' exact location

and size, beam association, and capacity allocation.

53.     On March 5, 2020, Defendant responded with questions concerning the technical annex, including how Eutelsat would handle a request from Defendant for additional capacity. Eutelsat's Director of Fleet and Capacity Planning responded to Gogo's Senior Manager of Satellite Network Engineering on March 6, 2020: "Regarding your request for additional capacity, the E10B satellite has been ordered as per the signed Service Order, but it has also been designed and optimized considering the capacity request shared by Gogo in our previous exchanges, which means that in case you would need additional resources to the one mentioned in the Service Order this can be discussed separately and defined jointly."  On March 13, 2020, Defendant indicated that it was working on its projection model and would revert to Eutelsat once it had completed that analysis.  Defendant never did.

54.     Also on March 5, 2020, Eutelsat's Deputy General Counsel followed up with Defendant's Associate General Counsel concerning the Draft Framework Agreement and requested that Defendant revert to Eutelsat with comments.  Defendant never did.

## G.     Defendant's Anticipatory Breach of the Service Order

55.     Less than two months after the Sale Transaction closed, on or about January 19, 2021, David Tolley, the EVP and Chief Financial Officer of Intelsat US LLC, sent a letter to Philippe Oliva regarding a purported "Term Sheet for Capacity on E10B." *See* Jan. 19, 2021 Letter from D. Tolley to P. Oliva Re: "Term Sheet for Capacity on E10B" (the "**January 19 Letter**"), a true and correct copy of which is attached hereto as **Exhibit F**.

56.     Tolley stated that, "[o]ver the past month, [Defendant] and its new owners reviewed all commercial discussions-in-progress at the time of the closing, including" what Tolley disingenuously referred to as "a certain undated term sheet for the potential lease of capacity on E10B that was signed sometime in 2019 (the 'Term Sheet')." *See* Ex. F.

57.     Tolley continued: "Please be advised that we do not intend to pursue a definitive agreement for capacity on E10B as described in the Term Sheet." *See id.*

58.     The January 19 Letter constituted a definite and unequivocal statement by Defendant that it would not perform under the terms of the Service Order and manifested Defendant's clear intent not to perform.

59.     On February 8, 2021, counsel for Eutelsat responded to Tolley and set forth Eutelsat's position that "there can be no question that the [Service Order] is an enforceable contract," since, *inter alia*:

a.     Defendant agreed under the Service Order to purchase capacity on E10B for a term of seven years and to pay Eutelsat $150 million in volume-based service fees over the course of that seven-year term;

b.     the Service Order states that its terms are "are binding between the parties," is executed by both parties, and was followed by the requisite approval of both parties' Boards; and

c.     Defendant itself recognized, at the time the parties executed the Service Order, that it had entered into a multi-year "satellite capacity *agreement* for high-speed inflight connectivity services."

60.     Counsel further stated that Defendant's refusal to abide by the terms of the agreement, as set forth in the January 19 Letter, constituted an anticipatory repudiation of the Service Order which gave rise to a claim for damages for total breach of contract.

61.     On March 31, 2021, counsel for Defendant responded and reiterated Defendant's refusal to perform under the terms of the Service Order and again manifested Defendant's clear intent not to perform.

**H.     Eutelsat's Diligent Attempts to Mitigate Its Losses**

62.     After receiving the January 19 Letter, Eutelsat began efforts to mitigate the

damages caused by Defendant's repudiation of the Service Order, including by attempting to sell segments of E10B's capacity to other companies and transferring customers already leasing capacity on Eutelsat's existing satellites to E10B.

63.     Notwithstanding these diligent efforts to sell the remaining capacity on E10B to other buyers, a significant portion of E10B's HTS capacity remains unsold.

## V.     CAUSES OF ACTION

### COUNT I
### ANTICIPATORY BREACH OF CONTRACT

64.     Eutelsat repeats and incorporates the allegations in Paragraphs 1 through 63 above as though fully set forth herein.

65.     As detailed above, the Service Order constitutes a valid and enforceable contract between Eutelsat and Defendant.

66.     Defendant anticipatorily breached the Service Order when it clearly and unequivocally advised Eutelsat on or about January 19, 2021 that "we do not intend to pursue a definitive agreement for capacity on E10B as described in the Term Sheet."

67.     The January 19 Letter constituted a definite and unequivocal statement by Defendant that it would not perform under the terms of the Service Order and therefore manifested Defendant's clear intent not to perform.

68.     As a direct and proximate result of Defendant's anticipatory breach of the Service Order, Eutelsat has suffered at least $150 million damages.

69.     In view of the foregoing, Eutelsat is entitled to damages from Defendant in an amount to be determined at trial, but not less than $150 million, plus consequential and incidental damages.

## COUNT II (IN THE ALTERNATIVE)
### PROMISSORY ESTOPPEL

70.     Eutelsat repeats and incorporates the allegations in Paragraphs 1 through 69 above as though fully set forth herein.

71.     Eutelsat understands that Defendant's position, developed only after it was acquired by Intelsat, is that the Service Order is not a valid and enforceable contract, which Eutelsat disputes.

72.     However, even if the Service Order does not constitute a valid and enforceable contract between Eutelsat and Defendant, on or about September 26, 2019, Defendant unambiguously promised to purchase capacity on the to-be-commissioned E10B satellite for a term of seven years and to pay Eutelsat $150 million in volume-based service fees over the course of that seven-year term.

73.     Eutelsat reasonably relied to its detriment upon Defendant's promise, including, without limitation, by procuring the E10B satellite.

74.     Eutelsat's reliance was expected and foreseeable, including, without limitation, because representatives of Eutelsat stated, during the Parties' negotiations, that Eutelsat would design E10B to Defendant's specifications and that Eutelsat would need a binding commitment from Defendant before approaching its Board of Directors about the procurement of E10B.

75.     As a direct and proximate result of Defendant's breach of its promise, Eutelsat has suffered damages in an amount to be determined at trial.

## COUNT III (IN THE ALTERNATIVE)
### BREACH OF THE OBLIGATION TO NEGOTIATE IN GOOD FAITH

76.     Eutelsat repeats and incorporates the allegations in Paragraphs 1 through 75 above as though fully set forth herein.

77. Eutelsat understands that Defendant's position, developed only after it was acquired by Intelsat, is that the Service Order is not a valid and enforceable contract, which Eutelsat disputes.

78. However, even if the Service Order does not constitute a valid and enforceable contract between Eutelsat and Defendant, the Service Order, which expressly provides that "[o]ther terms (incl. SLA, service credit, restoration, etc.) shall be further negotiated between the parties," constitutes a mutually binding obligation to negotiate the non-material terms of the Service Order in good faith.

79. Eutelsat satisfied its obligation to negotiate the "other," non-material terms of the Service Order in good faith, negotiating with Defendant in an effort to arrive at agreement with respect to those non-material terms and preparing and transmitting to Defendant the Draft Framework Agreement (based upon the MSA which Defendant had already agreed to and signed) reflecting those non-material terms.

80. Defendant breached its obligation under the Service Order to negotiate in good faith, including, without limitation, by failing to respond to or comment on the Draft Framework Agreement and by unilaterally terminating negotiations with Eutelsat because, on information and belief, Intelsat planned for Defendant to purchase capacity on Intelsat's own satellites.

81. But for Defendant's bad faith, the Parties would have made a final contract, and the loss of the benefit of that contract is a consequence of Defendant's bad faith.

82. Accordingly, as a direct and proximate result of Defendant's breach of its obligation under the Service Order to negotiate in good faith, Eutelsat suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Eutelsat respectfully requests that this Court enter judgment in its favor and against Defendant as follows:

a.    Awarding Eutelsat a money judgment in the amount of not less than $150 million;

b.    Awarding Eutelsat any additional  damages incurred by Eutelsat in an amount to be determined at trial; and

c.    Awarding Eutelsat such other and further relief as the Court deems just and proper.

Dated: September 7, 2022                    Respectfully submitted,

/s/ *Lynn H. Murray*
SHOOK, HARDY & BACON LLP
Lynn H. Murray (IBN 6191802)
lhmurray@shb.com
111 S. Wacker Dr., Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
Fax: (312) 558-1195

David J. Lender (*pro hac vice forthcoming*)
Jennifer Brooks Crozier (*pro hac vice forthcoming*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel.  (212) 310-8000
Fax  (212) 310-8007
david.lender@weil.com
jennifer.crozier@weil.com

*Attorneys for Plaintiff*
*Eutelsat S.A.*

# Exhibit A

*Strictly confidential*

## SERVICE ORDER FOR SATELLITE CAPACITY ON E10B

### Key commercial T&Cs

The table below sets out the key binding commercial terms in relation to the allotted satellite capacity on E10B.

| Topic | Details | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Contract duration | • 7 years from satellite OSD with 3-year ramp-up in volume | | | | | | | |
| Volume | • Firm commitment on HTS and Global Spots allotted capacity<br>• 4:1 Forward:Return ratio | | | | | | | |
| | **E10B** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **Year 6** | **Year 7** |
| | Total HTS capacity (GHz) | 3.8 | 4.2 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 |
| | Price per MHz per month ($) | 370 | 370 | 370 | 370 | 370 | 352 | 334 |
| | **Annual service charge ($M)** | **16.7** | **18.8** | **20.8** | **20.8** | **20.8** | **19.8** | **18.8** |
| | Total Global Spots capacity (MHz) | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| | Price per MHz per month ($) | 1 310 | 1 310 | 1 310 | 1 310 | 1 310 | 1 245 | 1 182 |
| | **Annual service charge ($M)** | **2.0** | **2.0** | **2.0** | **2.0** | **2.0** | **1.9** | **1.8** |
| Pricing | • HTS: USD370/MHz per month, then decreasing by 5% per annum after Year 5<br>  Average USD362/MHz per month<br>• Global Spots: USD1,310/MHz per month, then decreasing by 5% per annum after Year 5 | | | | | | | |

| Annual service fee ($M) | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Total |
|---|---|---|---|---|---|---|---|---|
| **Annual service fee** — *HTS* | | | | | | | | |
| Volume-based service fee | 16.7 | 18.8 | 20.8 | 20.8 | 20.8 | 19.8 | 18.8 | 136.5 |
| **Service fee ($M)** | **16.7** | **18.8** | **20.8** | **20.8** | **20.8** | **19.8** | **18.8** | **136.5** |
| *Global Spots* | | | | | | | | |
| Volume-based service fee | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 1.9 | 1.8 | 13.5 |
| **Service fee ($M)** | **2.0** | **2.0** | **2.0** | **2.0** | **2.0** | **1.9** | **1.8** | **13.5** |
| **Total service fee ($M)** | **18.6** | **20.7** | **22.8** | **22.8** | **22.8** | **21.7** | **20.6** | **150.0** |

| Topic | Details |
|---|---|
| Others | • Gateway fees are not included<br>• Pricing benchmark after Year 5 based on HTS Ku for aero over similar geographic coverage for satellites located within +/- 10° of E10B and other conditions to be jointly agreed. Subject to availability, if benchmark price is lower than proposed price, Eutelsat would provide additional capacity on E10B so that blended price becomes in line with benchmark price – otherwise price shall be aligned with benchmark price<br>• Portability between satellites<br>  o Limited to 15% of the annual service charge of a given mission after Year 5 per year, and up to a total ported capacity of 30%, of which a maximum of 10% to Ka-band capacity<br>  o Transferable to another HTS mission (Ka or Ku) in Eutelsat fleet at the prevailing rate, subject to availability<br>• Portability of Global Spots to HTS within E10B |

MA

*Strictly confidential*

|  |  |
|---|---|
|  | ○ Up to 50% of Global Spots capacity (i.e. 63 MHz), for a dollar equivalent of HTS capacity, subject to availability<br>• Interim satellite capacity: Eutelsat will work in good faith with GOGO to identify suitable interim satellite capacity over Middle East area based on GOGO requirements, subject to availability |
| **Timeline** | • Expected In Service Date: April 2023 |
| **Conditions** | • Terms in this Term Sheet are binding between the parties<br>• Subject to respective Board approvals<br>• Other terms (incl. SLA, service credit, restoration, etc.) shall be further negotiated between the parties |

Oakleigh Thorne, Gogo CEO

Michel Azibert, Eutelsat Deputy CEO

# Exhibit B

Gogo Meets Significant Inflight Connectivity Demand through Deal with Eutelsat

# Press Releases

**Gogo Meets Significant Inflight Connectivity Demand through Deal with Eutelsat**

Share:

**Increases Ku capacity over Europe and the Middle East**

Oct 29, 2019

PARIS and CHICAGO, Oct. 29, 2019 /PRNewswire (http://www.prnewswire.com/)/ -- Gogo (NASDAQ: GOGO), a leading global provider of broadband connectivity products and services for aviation, together with Eutelsat Communications (Euronext Paris: ETL), one of the world's leading satellite operators, announced today a new satellite capacity agreement for high-speed inflight connectivity services. As part of the new multi-year agreement, Gogo has leased HTS bandwidth on EUTELSAT 10B satellite, to be leveraged over Europe and the Middle East. The new satellite is set to launch in 2022.

"We are advancing capacity capabilities given the growing demand for high-speed inflight connectivity services," said Oakleigh Thorne, president and CEO of Gogo. "Through our partnership with Eutelsat, Gogo 2Ku will continue to enable the best passenger experience for global airlines."

"We are thrilled about our ongoing relationship with Gogo, a long-standing partner and a leading provider for inflight connectivity," said Philippe Oliva, Eutelsat's Chief Commercial Officer. "This agreement highlights the relevance of our newly ordered EUTELSAT 10B for inflight connectivity and we look forward to supporting Gogo as they increase capacity in Europe and the Middle East to provide the best services to their airline partners."



## About Gogo

Gogo is the Inflight Internet Company.  We are the leading global provider of broadband connectivity products and services for aviation. We design and source innovative network solutions that connect aircraft to the Internet and develop software and platforms that enable customizable solutions for and by our aviation partners.  Once connected, we provide industry leading reliability around the world. Our mission is to help aviation go farther by making planes fly smarter, so our aviation partners perform better and their passengers travel happier.

You can find Gogo's products and services on thousands of aircraft operated by the leading global commercial airlines and thousands of private aircraft, including those of the largest fractional ownership operators.  Gogo is headquartered in Chicago, IL with additional facilities in Broomfield, CO and locations across the globe. Connect with us at gogoair.com (https://c212.net/c/link/?t=0&l=en&o=2625025-1&h=927512773&u=http%3A%2F%2Fgogoair.com%2F&a=gogoair.com).

**Media Relations Contact:**
Dave Mellin
+1 720-840-4788
dmellin@gogoair.com
(mailto:dmellin@gogoair.com)

**Investor Relations Contact:**
William Davis
+1 312-517-5725
ir@gogoair.com
(mailto:ir@gogoair.com)

**Cautionary Note Regarding Forward-Looking Statements**

Certain disclosures in this press release include "forward-looking statements" that are based on management's beliefs and assumptions and on information currently available to management. Most forward-looking statements contain words that identify them as forward-looking, such as "anticipates," "believes," "continues," "could," "seeks," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "projects," "should," "will," "would" or similar expressions and the negatives of those terms that relate to future events. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of

this press release and Gogo undertakes no obligation to update or revise publicly any such forward-looking statements, whether as a result of new information, future events or otherwise. These forward-looking statements are based on estimates and assumptions by our management that, although we believe to be reasonable, are inherently uncertain. Important factors that could cause actual results, developments and business decisions to differ materially from these forward-looking statements include the uncertainties described under the heading "Risk Factors" in the Company's Annual Report on Form 10-K filed with the SEC on February 22, 2019 and Quarterly Report on Form 10-Q filed with the SEC on August 8, 2019.

**About Eutelsat Communications**

Founded in 1977, Eutelsat Communications is one of the world's leading satellite operators. With a global fleet of satellites and associated ground infrastructure, Eutelsat enables clients across Video, Data, Government, Fixed and Mobile Broadband markets to communicate effectively to their customers, irrespective of their location. Over 7,000 television channels operated by leading media groups are broadcast by Eutelsat to one billion viewers equipped for DTH reception or connected to terrestrial networks. Headquartered in Paris, with offices and teleports around the globe, Eutelsat assembles 1,000 men and women from 46 countries who are dedicated to delivering the highest quality of service. For more about Eutelsat go to www.eutelsat.com (https://c212.net/c/link/?t=0&l=en&o=2625025-1&h=3384598988&u=http%3A%2F%2Fwww.eutelsat.com%2F&a=www.eutelsat.com)

**Media**

| | | |
|---|---|---|
| Marie-Sophie Ecuer | Tel.: + 33 1 53 98 37 91 | mecuer@eutelsat.com (mailto:mecuer@eutelsat.com) |
| Jessica Whyte | Tel.: + 33 1 53 98 37 91 | jwhyte@eutelsat.com (mailto:jwhyte@eutelsat.com) |
| **Investors** | | |
| Joanna Darlington | Tel.: +33 1 53 98 35 30 | jdarlington@eutelsat.com (mailto:jdarlington@eutelsat.com) |
| Cédric Pugni | Tel.: +33 1 53 98 35 30 | cpugni@eutelsat.com (mailto:cpugni@eutelsat.com) |
| Alexandre Enjalbert | Tel.: +33 1 53 98 35 30 | aenjalbert@eutelsat.com (mailto:aenjalbert@eutelsat.com) |

SOURCE Gogo

Loading...

If you're interested in receiving Gogo breaking news via email, fill out the form below and you will receive an e-mail each time we send out a new release. You will receive an email which you must reply to in order to confirm you subscription. You may unsubscribe from our list at anytime.

| First Name | Last Name |
| --- | --- |
| * Email | Organization |

* Required Fields

**SUBMIT**

Press room (https://gogoair.mediaroom.com/press-room)

Press Releases (https://gogoair.mediaroom.com/press-releases)

Images (https://gogoair.mediaroom.com/image-gallery)

Videos (https://gogoair.mediaroom.com/videos)

News Alerts (https://gogoair.mediaroom.com/news-alerts)

**(HTTPS://WWW.FACEBOOK.COM/GOGO)**       **(HTTPS://TWITTER.COM/GOGO)**

**(HTTPS://WWW.LINKEDIN.COM/COMPANY/GOGO)**       **(HTTPS://WWW.INSTAGRAM.COM/GOGOAIR/)**

CONCOURSE BLOG (HTTPS://CONCOURSE.GOGOAIR.COM/)

PRESS ROOM (HTTPS://WWW.GOGOAIR.MEDIAROOM.COM/)

INVESTORS (HTTPS://WWW.IR.GOGOAIR.COM/)

LEADERSHIP (HTTPS://WWW.GOGOAIR.COM/ABOUT-GOGO/LEADERSHIP/)

CONTACT US (HTTPS://WWW.GOGOAIR.COM/CONTACT-US/)

**WE'RE HIRING (HTTPS://WWW.GOGOAIR.COM/CAREERS/)**

© 2017 GOGO LLC. ALL TRADEMARKS ARE THE PROPERTY
OF THEIR RESPECTIVE OWNERS.

TERMS OF USE (HTTPS://CONTENT.GOGOAIR.COM/TERMS/?LANG=EN_US)

PRIVACY POLICY (HTTPS://CONTENT.GOGOAIR.COM/PRIVACY/?LANG=EN_US)

OTHER POLICIES (HTTPS://WWW.GOGOAIR.COM/POLICIES/)

SITE MAP (HTTPS://WWW.GOGOAIR.COM/SITE-MAP/)

# Exhibit C

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT
GOGO - Q3 2019 Gogo Inc Earnings Call

EVENT DATE/TIME: NOVEMBER 07, 2019 / 1:30PM GMT

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

### CORPORATE PARTICIPANTS

**Barry L. Rowan** *Gogo Inc. - CFO & Executive VP*

**Oakleigh B. Thorne** *Gogo Inc. - President, CEO & Director*

**William G. Davis** *Gogo Inc. - VP of IR*

### CONFERENCE CALL PARTICIPANTS

**Gregory Thomas Gibas** *Northland Capital Markets, Research Division - VP & Senior Research Analyst*

**Lance William Vitanza** *Cowen and Company, LLC, Research Division - MD & Cross-Cap Structure Analyst*

**Landon Hoffman Park** *Morgan Stanley, Research Division - Research Associate*

**Louie DiPalma** *William Blair & Company L.L.C., Research Division - Analyst*

**Philip A. Cusick** *JP Morgan Chase & Co, Research Division - MD and Senior Analyst*

**Richard Hamilton Prentiss** *Raymond James & Associates, Inc., Research Division - Head of Telecommunication Services Equity Research*

**Scott Wallace Searle** *Roth Capital Partners, LLC, Research Division - MD & Senior Research Analyst*

### PRESENTATION

**Operator**

Ladies and gentlemen, thank you for standing by. And welcome to the Q3 2019 Gogo, Inc. Earnings Conference Call. (Operator Instructions) Please be advised that today's conference call may be recorded. (Operator Instructions)

I would now like to hand the conference over to your speaker today, Mr. Will Davis, Vice President or Investor Relations. Sir, please go ahead.

---

**William G. Davis** *- Gogo Inc. - VP of IR*

Thank you, and good morning, everyone. Welcome to Gogo's Third Quarter 2019 Earnings Conference Call. Joining me today to talk about our results are Oakleigh Thorne, President and CEO; and Barry Rowan, Executive Vice President and CFO.

Before we get started, I would like to take this opportunity to remind you that during the course of this call, we may make forward-looking statements regarding future events and the future financial performance of the company. We caution you to consider the risk factors that could cause actual results to differ materially from those in the forward-looking statements on this conference call. These risk factors are described in our press release filed this morning and are more fully detailed under the caption Risk Factors in our annual report on Form 10-K and 10-Q and other documents we have filed with the SEC.

In addition, please note that the date of this conference call is November 7, 2019. Any forward-looking statements that we make today are based on assumptions as of this date. We undertake no obligation to update these statements as a result of new information or future events.

During the call, we will present both GAAP and non-GAAP financial measures. We include a reconciliation and explanation of adjustments and other considerations of our non-GAAP measures to the most comparable GAAP measures in our third quarter earnings press release.

This call is being broadcast on the Internet and available on the Investor Relations section of Gogo's website at ir.gogoair.com. The earnings press release is also available on the website. After management comments, we will host a Q&A session with the financial community only.

It is now my great pleasure to turn the call over to Oakleigh.

2

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Thanks, Will. Good morning, and welcome to our Q3 2019 Earnings Call.

We're pleased to announce a very strong quarter, with adjusted EBITDA and free cash flow well above our expectations. Though, as we predicted on our last call, service revenue was down as a result of the final American Airlines deinstalls and conversions in turnkey to the airline directed model.

Though we're not happy about that decline in revenue, it's worth noting that underlying growth has made up for a lot of that loss. We achieved $158 million of service revenue in Q3 this year, which is right about where service revenue stood. [In quarter], the deinstall program began in earnest in early 2018. I'm also pleased that despite having an extra interest payment in the year, we remain on target to improve free cash flow by $100 million over the prior year.

I'll leave the rest of the numbers to Barry and now move on to some of the operational aspects of the business. And then I'll turn to strategy.

It goes without saying that these are very exciting times at Gogo as we scaled our operations in support of Delta Airlines' desire to provide free internet service to its passengers, as we make great progress on our Gogo 5G product initiative and as we work with our satellite partners on new and exciting ways to serve the aero IFC market. It's also exciting to see a nice bounce back on our Business Aviation division, as OEMs made some nice catch-up orders in the quarter and some of the ADS-B congestion cleared up in the aftermarket.

And perhaps most exciting. Today, we expect to sign a contract with a very prestigious EMEA airline, install Gogo 2Ku and live TV on a significant portion of their wide-body fleet. A formal announcement will be forthcoming. But needless to say, I'm happy to get Gogo back in the wind tunnel.

I'm very proud of my Gogo teammates for delivering such a great quarter. We've worked hard over the past year to improve our operations, execute on our strategy and achieve our financial goals. And I think we're making great progress. So thank you.

Let me touch on strategy for a minute. And then I'll turn to our three business segments to discuss some operational aspects of the quarter.

Strategic front. Today, I'd like to talk about our network strategy. We believe that the market for and revenue from the connected aircraft is poised for accelerating growth as airlines increasingly look at providing free IFE to passengers, as the aviation ecosystem looks for cheaper and faster ways to access operational data. Our strategy is to take advantage of this explosion in demand by positioning ourselves as the provider of the most trusted broadband communication systems in the aviation ecosystem. Today, we serve that market with two network solutions: the Ku satellite network and air-to-ground network.

In the satellite world, we pursue an open architecture asset-light operating model. Today, we work with 11 satellite providers and use 33 satellites to create and manage a seamless near-global network. Though we're band agnostic, today we operate in the Ku-band because there are hundreds of Ku satellites. And we can layer capability where it's needed, we can scale as demand grows and we can provide more redundancies in closed Ka constellations.

I want to highlight the importance of redundancy for just a second. In the last 8 months, three important satellites have failed on orbit or on launch. With the loss of Intelsat 29E this year, Ku supply in [conus] is tight. The Ku service providers have still been able to serve their customers by utilizing other Ku satellites. In contrast, if they were on a three-satellite closed Ka system, the networks for one-third of the world would be dead to their airline customers for an extended period of time.

The satellite world is going through a tremendous amount of change. And our asset-light model gives us the flexibility to harness that change to do what is best for our customers. We see the costs of satellites coming way down, as manufacturers apply assembly line techniques to satellite manufacturing and as innovation in the launch sector drives down launch costs. That enables satellite operators to get more bang for their CapEx bucks and lower the unit price they charge service providers like Gogo.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

New software-defined payloads will improve capacity utilization, both for operators and for service providers like Gogo, further driving down our unit costs. The advent of LEO or NEO constellations should give us the ability to drive down latency, which will improve the user experience in our customers' aircraft and provide truly global coverage.

Finally, we've always said that we were band agnostic. And with the arrival of more open Ka capacity, we're getting the chance to prove that. And we've actually started pitching regional Ka solutions where appropriate. We'll have more to say on that in the future.

Our satellite partners are talking to us about all of these opportunities, because we're a very attractive partner. IFC is the fastest-growing market segment for satellite operators, and we're the largest player in the IFC space. So if you want to play in this segment, you want Gogo as a partner. Given all that change, we want to be nimble, take advantage of the best of what our satellite partners have to offer to deliver the best experience for the dollar to our airline and business jet owners.

Now let me turn to our air-to-ground network. Starting more than 25 years ago, Gogo pioneered air-to-ground networks for aviation. Today, our ATG 4G network supports more than 5,500 business aircraft and more than 1,500 commercial aircraft. Our competitive advantages in ATG are our proprietary 4 MHz of spectrum, our deep knowledge of how to build ATG networks and our portfolio of intellectual property. We've built three ATG networks and are now building our fourth, Gogo 5G.

We just announced our three strategic partners in making the new network come to life: Cisco, Airspan Networks and First RF Corp; all leading U.S.-based providers of wireless network technology. We'll be building our network on 5G standards and be able to deliver higher throughput and lower latency for a better passenger experience than potential competitive offerings. We'll also be bonding our 4 MHz of licensed spectrum with 60 MHz of unlicensed spectrum to provide more bandwidth than our classic ATG products without sacrificing the resiliency that licensed spectrum provides.

We're starting to talk about 5G to airlines for regional fleets and even some mainline fleets. And we're talking to business aviation owners, operators and dealers about 5G for their business aircraft. And so far, we're getting a very positive response. We remain on track to deliver this product in 2021 and are very excited about the value it could create for our company and our partners.

Now let me turn back to the quarter. As I said earlier, we had strong results, though we want to be cautious about Q4 . The American deinstalls and AD conversion will continue to be a drag on revenue versus prior year. Satellite expense will increase as more 2K aircraft come online, as usage grows and as we ramp in anticipation of significantly more demand in 2020. And we expect to incur increased investments in key programs like line-fit and Gogo 5G. Some of these headwinds and others will persist in 2020. And Barry will discuss those in his comments.

As for our segment results. Let me start with the star of the quarter, our BA division. Before I even get into the operational metrics, I want to talk about the National Business Aviation Association show I attended in Las Vegas 2 weeks ago. We announced our 5G partners, we had a great panel discussion, and our booth was packed all week. It's a real pleasure to talk to our BA customers. They love our products, whether they have AVANCE or the classic products. And they love our service, which is testimony to our great Business Aviation team.

BA achieved record revenue of 11% over prior year, record segment profit and record aircraft online for the quarter. Equipment revenue significantly outperformed expectations due to AVANCE sales in both the OEM and aftermarket channels. OEM sales were driven by some nice catch-up orders for AVANCE L5. And aftermarket sales improved as some of the ADS-B congestion began to subside at the large dealers. We still expect to see some ADS-B-related drag on aftermarket sales through the second quarter of next year. But it's nice to see the logjam start to break.

As a result of these trends, we're raising our previously revised 2019 revenue guidance for BA to the high end of the $290 million to $300 million range we shared last quarter. Our BA division continued to exercise strong expense control in the quarter and is expected to hit their cash flow target for the year despite the weak sales it experienced in the first half.

BA ATG installed plane count grew to 5,527, up 508 aircraft or 10% from Q3 2018; and increased by 65 aircraft from Q2 this year. Even more encouraging, we shipped 293 ATG units in the quarter, almost as high as the record 296 ATG units shipped in Q3 last year.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

Service ARPU for ATG units grew to $3,087 per month, up 2.6% from $3,008 per month in Q3 2018. We're now up to seven OEMs that have cut AVANCE into line-fit and expect two more in 2020, which bodes well for future equipment sales.

We think our Business Aviation division is a great business. It addresses a large underpenetrated market, it has an exciting new product pipeline, it provides a resilient recurring service revenue stream, and it exhibits nice operating leverage because of the low fixed cost nature of our proprietary ATG network.

Now let me make a few comments on the combined CA segments and then dive into the Rest of World and North American segments separately. I'll start with some good news, which is that our 2Ku product is operating well, with record net promoter scores at customers that provide us with NPS numbers. NPS scores have also improved nicely for our ATG network, as traffic has been offloaded to our satellite network. And in fact, at one customer, our ATG NPS beat some of our competitors' satellite NPS scores.

We're also proud that Delta Airlines, who exclusively uses Gogo for WiFi in their aircraft, won the prestigious APEX Passenger Choice Award for best WiFi, voted on by 1.4 million passengers, beating JetBlue, who won the year before and is supplied by a competitor.

Also on the positive side, we continue to make progress in supporting Delta Airlines in their announced intention to bring free WiFi to their passenger base. We're very excited about this endeavor. However, we'll leave it to Delta to announce their plans for what and when they plan to roll out.

Turning to CA combined revenue. As we discussed in our Q2 call, Q3 was the first quarter to suffer the full impact of the American Airlines deinstalls and transition from the turnkey model to the airline-directed model. In total, these changes created a $100 million hole in our service revenue from when the deinstalls started early 2018, which we've been able to largely offset by growth at our other airlines and in our Business Aviation division.

Costs remained in check at CA this quarter, and we got some benefit from positive equipment margin as well. We now expect growth in aircraft online at our combined CA segments throughout our planning horizon and feel that the CA segments will return to revenue growth in 2020.

The end of the quarter, we had almost 1,302 Ku aircraft online, a net increase of 73 with another 845 in backlog. 62% of our 2Ku backlog is in Rest of World, which represents great new revenue potential. And 38% is in North America, which are mostly ATG upgrades and represent an opportunity for increased ARPA as they move to faster 2Ku service.

Take rates grew slightly in CA-NA over prior year and were down slightly in CA-Rest of World due to new fleet installations. The combined profits of the CA segments was slightly negative but well ahead of expectations and well ahead of prior year.

Overall, we expect a lot of activation activity in Q4 but still expect to be at the low-ish end of our guidance of 400 to 475 installs for the year, as some airlines have held back planes to make up for missed MAX deliveries, as others have delayed for internal scheduling reasons, and some as a result of the government shutdown earlier in the year.

As far as MAXes generally, we've installed seven for the year. And in total, we have a backlog of 36, which includes our first line-fit Boeing aircraft, scheduled for the fourth quarter this year. Obviously, that schedule could change given the fluid MAX situation. But when it does occur, it will be our first major OEM line-fit installation and a watershed moment for Gogo. We had one first-of-type induction in Q3, the Cathay Pacific A330-300.

In summary for the combined CA segments. We're excited about the potential of our CA business. Global wireless usage trends are solid and improving and will drive demand for free WiFi in aircraft, which will spur demand for our products and services. And the total addressable market is large and relatively untapped, with only about 35% of aircraft globally installed with a broadband IFC product today. We believe there will be 18,000 new or retrofit aircraft installed with broadband over the next decade and that we can win our fair share of that addressable market.

Now I'll get into a little detail on Commercial Aviation North America and then on Commercial Aviation Rest of World.

We had 69 gross additions in CA-NA for the quarter, down a little from 74 prior year, down from 92 in Q2. Net additions were at negative 21 for the quarter. As many of the gross installs were ATG upgrade, some airlines retired older ATG aircraft. We expect a significant uptick in installs for Q4,

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

most of which will be turnkey ATG upgrades. I should note that as we look at Q4 we expect to take a small revenue hit from one third-party payer that is experiencing financial difficulties.

In Rest of World. Obviously, our new airline contract is our biggest news. But more generally, we had a good quarter. We signed a restructured contract with one of our Latin American partners that will lower our equipment subsidies and improve Gogo cash flow over the next few years. As for installs, it was a seasonally slow quarter, with 31 gross additions versus 50 for Q2 and one deinstall. We expect to significantly increase in ROW installations for Q4, most of which will be under the airline-directed model. And we should approach 200 net additions for the year.

We plan to drive our ROW segment to profitability over the next few years by installing our backlog, ramping ARPA, reducing costs as line-fit gets completed, utilizing our Satcom capacity more efficiency and driving down Satcom unit costs.

So let me conclude my comments by saying that we had a strong first three quarters of the year. And though we're not all the way out of the woods, we have made great progress.

With that, let me turn it over to Barry to do the numbers.

---

**Barry L. Rowan** - *Gogo Inc. - CFO & Executive VP*

Thanks, Oak. Let's jump right in, beginning with a summary of our third quarter results.

Gogo delivered another great quarter of financial performance, with adjusted EBITDA and cash flow both substantially exceeding our expectations. This was the third quarter in a row that adjusted EBITDA exceeded $35 million. This quarter's outperformance was driven by a rebound in Business Aviation and Commercial Aviation expenses remaining below budget.

On a sequential basis, BA equipment revenue was up 58%, and segment profit was up $6 million. CA's expenses have continued to run below plan for both Satcom and overall operating expenses. From January through September, we have delivered $111 million in adjusted EBITDA, exceeding 2018's full year performance of $71 million by over 50%. We are raising our adjusted EBITDA guidance as we have done in each of the last five quarters, this time to $120 million to $130 million for the full year 2019. At the midpoint, this represents a 76% year-over-year increase in adjusted EBITDA.

In addition to the strong adjusted EBITDA performance, we have dramatically reduced our cash burden. During the quarter, we achieved record positive free cash flow of approximately $34 million. During the first three quarters of 2018, we've earned $216 million in cash versus just $3 million for the comparable period this year. For the second quarter in a row, unlevered free cash flow was above $30 million at a positive $33 million. We continued to project positive unlevered free cash flow for the full year 2019.

This improved cash flow performance is the result of the very strong adjusted EBITDA achieved during the first three quarters of the year, lower airborne equipment investments and improvements in networking capital. We are achieving the aggressive targets we set for reduced inventory purchases and improving accounts receivable during the year.

As we have guided since the beginning of the year, we are on target to improve free cash flow this year by at least $100 million over 2018. This is a particularly important achievement, considering that our net cash interest expense for the year will be $39 million higher in 2019 versus 2018. This year's higher interest expense is primarily due to making three interest payments on our senior secured debt during the year due to the timing of our refinancing.

We are, of course, very pleased with the adjusted EBITDA improved cash flow performance we've been able to achieve for the first three quarters of 2019. However, we do want to make sure that we properly set expectations for the balance of the year. In that spirit, I'll offer some perspective on how we view both adjusted EBITDA and free cash flow developing for the fourth quarter.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

First, regarding adjusted EBITDA. While Satcom expense is still running well below plan, we do expect these expenses to increase again in the fourth quarter as we enter into contracts to serve the increasing demand from our customers. In addition, some CA expenses were delayed from this quarter that we will expect to incur in future periods.

As you will note, our raised 2019 adjusted EBITDA guidance implies fourth quarter adjusted EBITDA of $19 million at the high end of the range. This compares to the over $35 million we achieved in each of the first three quarters.

As we look at free cash flow for the fourth quarter, there are some known outflows that will reduce it from this quarter's record level. Given that free cash flow has improved by over $200 million for the first three quarters, let me highlight the primary reasons we expect it to come in closer to $100 million improvement for the year.

First, we have $54 million in interest payments due during the fourth quarter and had none in the third quarter. Secondly, we expect working capital to be a use of cash in the fourth quarter due to some anticipated swings in the timing of working capital.

Before we turn to our operational performance, let me highlight a couple of additional points regarding our balance sheet. We did put the asset-backed loan facility in place, as we indicated on our last earnings call. This $30 million facility carries an interest rate of LIBOR plus 2%, translating to approximately 4% at today's rate. While these funds are not available to us, we have not [inaudible] on the facility. We're also pleased that the debt instruments within our capital structure are performing well. Both the senior secured notes and the 6% convertible notes are trading well above par.

I'll now turn to a discussion of our third quarter operating results, starting at the consolidated level. Consolidated revenue was $201 million, down 7% from a year ago, reflecting the planned reduction in revenue from American Airlines. Consolidated service revenue was $158 million for the quarter, essentially flat from a year ago. We expect revenue to increase in 2020 as we add new aircraft in CA and with an outlook for resumed growth in BA's total revenue.

Our bottom-line performance has benefitted from disciplined cost management across both CA and BA. For the first 9 months of this year, department and Satcom expenses are approximately $28 million below our internal budget on a combined basis. As we will discuss, some of this expense benefit is timing related. While there is more we can do to continue driving operational and financial discipline in the company, it has improved substantially during the past year.

Now let's move to a discussion of the business segments, starting with Business Aviation. We were very pleased to see the BA business rebound in the third quarter. Total revenue for BA increased to $81 million, up 11% from the third quarter of 2018, as both service and equipment revenue grew during this quarter.

Service revenue increased to $55 million, up 12% from the prior year period. This was primarily driven by a 10% increase in ATG aircraft online to 5,527 at the end of the quarter. Monthly service revenue for ATG aircraft online increased to $3,087, up nearly 3% from $3,008 in the prior year period.

The weakening trends in equipment revenue we saw during the first half of the year tied to the ADS-B delay are starting to reverse. BA equipment revenue increased 58% sequentially on the strength of our premier AVANCE L5 product line. We are seeing OEMs accelerate their purchases ahead of planned [airtran] sales, and dealers are again building inventory. Equipment revenue for this quarter matched the all-time high of $26 million achieved in the second quarter of 2018 during the highly successful AVANCE product rollout.

Driven by this growth in equipment revenue and an attractive product mix, BA equipment margins increased from 28% in the second quarter of this year to 43% this quarter. This is back in line with BA's historical equipment margins. Segment profit of $37 million was up sequentially by $6 million or 18%, primarily driven by the growth in revenue. Based on these strong operating results, segment profit margin grew to 45.4% during the quarter, up from 43.9% sequentially.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

Now I'll turn to a discussion of our Commercial Aviation division, starting with CA-North America and Rest of World on a combined basis. It's worth highlighting three developments with four separate airlines which influence CA's results this quarter and going forward.

First is the completion of the American Airlines deinstallations and the full impact of the airline switch to the airline-directed model. This has meaningfully reduced our revenue and associated profitability, as I've mentioned, and will make for a difficult comparison through the second quarter of 2020.

Second is the successful renegotiation of the contract with a Latin American carrier, as Oak also described. This represents a significant improvement in the 5-year NPV of the contract and is a great validation of one of the key objectives we established as part of our integrated business plan.

Third, we said on our February earnings call that we expected two airlines to switch back from the airline-directed business model to the turnkey business model during 2019. The first one of these occurred in the first quarter, and the second occurred in the third quarter.

The headlines for our Commercial Aviation business in 2019 are that even as CA has endured some significant headwinds, service revenue for the first 9 months is up almost 3% over the same period last year. And CA's bottom line has performed well ahead of expectation due to strong cost controls and the timing of expenses.

For the first three quarters of last year, CA's segment profit was negative $52 million. For the first three quarters of this year, it is a positive $10 million, including a modest loss of less than $2 million this quarter. Importantly, this $52 million segment profit improvement also reflects a considerable narrowing of the year-to-date losses in CA-ROW.

The strong CA segment profit is largely due to Satcom expenses [under-running] plan and the reduction in other operating expenses we targeted. We anticipate that our Satcom expense will come in more than $15 million below our 2019 budget. However, we do expect Satcom expenses to increase again on an absolute basis in the fourth quarter and next year to meet the demand created by growing passenger usage.

As you'll recall, through our integrated business plan process, we identified $75 million in annual savings in CA department spend excluding Satcom expense between the time we announced that plan in mid-2018 and the end of 2020. On our last earnings call, we said we expected to achieve approximately $45 million of those savings or 60% of the target this year. We now expect to achieve approximately $50 million or two-thirds of that reduction this year. However, it is also important to note that some of this is due to deferred expenses, which we expect to incur in future periods.

CA's $62 million improvement and year-to-date segment profit over the previous year has clearly been a major contributor to our dramatically improving free cash flow performance this year. In parallel, we've also made significant strides in working capital management. Most of the cash flow improvement from working capital has come through our planned slowing of inventory purchases and improving accounts receivable.

Now I'll turn to a discussion of the operating results for Commercial Aviation North America. Total revenue for CA-NA decreased to $84 million in the third quarter, down 22% from the third quarter of 2018, reflecting anticipated declines in both service and equipment revenue. Service revenue was approximately $80 million, down 14% from the third quarter of 2018, primarily due to the impact of American Airlines. Excluding this airline, service revenue was up 7% over the prior year. We continue to expect revenue growth to resume for CA-NA in 2020.

Equipment revenue declined 76% to $3.7 million, as compared with $15 million for the prior year period. This decline was due to lower 2Ku installations and a shift in mix from airline-directed to turnkey installations. As Oak described, we expect total 2Ku installations to increase meaningfully in the fourth quarter on a sequential basis.

Total take rate for CA-NA grew year-over-year to 12 7% and, excluding American Airlines, net ARPA was up 3% year-over-year to $132,000. Largely driven by expenses coming in well below plan, CA-NA contributed about $42 million of the over $60 million improvement in CA's combined segment profit for the first 9 months of this year.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

Now let's turn to CA-ROW, which also delivered a strong third quarter. CA-ROW total revenue was approximately $36 million, up 1% from a year ago. Service revenue increased to $22.6 million, up 28% from the third quarter of 2018 as we brought additional aircraft online. Equipment revenue decreased to $13.1 million, down from $17.6 million in the third quarter of 2018, due to a lower number of installs under the airline-directed model.

As expected, ROW take rates and ARPA both decreased over the year-ago quarter due to the significant growth in new aircraft fleets coming online. As we've described on previous calls, both the ARPA and take rates are substantially higher for existing airlines as the new aircraft fleets mature.

Aircraft from new airlines represented 49% of total ROW aircraft online at the end of the quarter, up from 30% a year ago. ROW aircraft online increased to 721, up 41% from 513 as of September 30, 2018, and we still have a healthy backlog of over 500 aircraft to be installed.

We're very pleased to see the losses narrowing for our CA-ROW segment. Segment loss in CA-ROW of $13.7 million improved 40% over the prior year period, driven by higher service revenue, continuing improvement in Satcom utilization and lower operating expenses. Through the first three quarters of this year, we reduced ROW losses by nearly 30% from negative $70 million in 2018 to negative $50 million for the comparable 9-month period this year.

I will now turn to a discussion of our 2019 guidance, which is summarized as follows. Total consolidated revenue in the range of $800 million to $850 million is unchanged. We expect CA-NA revenue to be at the high end of the previously guided range of $355 million to $380 million, with approximately 5% from equipment revenue, no change from prior guidance. We expect CA-ROW revenue to be at the high end of the previously guided range of $135 million to $150 million, with approximately 40% coming from equipment revenue, no change from prior guidance. We now expect BA revenue to be at the high end of the previously revised range of $290 million to $300 million.

We're raising our adjusted EBITDA guidance to a range of $120 million to $130 million, an increase from our prior guidance of $105 million to $115 million. As a reminder, the adjusted EBITDA guidance provided on our February 2019 call was $75 million to $95 million. We expect the increase in 2Ku aircraft online to be at the low end of the previously guided range of 400 to 475.

While we won't be discussing 2020 guidance on this call, we thought it might be helpful to offer some perspective on the puts and takes as we look forward to next year. We're very positive about the progress we have made in the last 12 months, as evidenced by this year's strong financial performance. But we also want investors to maintain a balanced perspective as we continue to build on Gogo's achievements.

In assessing our 2019 performance, it's important to recognize that year-to-date adjusted EBITDA has benefitted from about $9 million of nonrecurring items. Now as we look to 2020, within BA, we'll be making meaningful investments in our 5G network in preparation for its commercial rollout planned for 2021.

These plans aren't new but are worth reiterating now that we have named our 5G vendors. BA revenue rebounded well in this quarter. But we are monitoring the potential impact on longer-term service revenue from the temporary delays in equipment sales due to ADS-B.

In CA, we will have effectively lapped the issues with American Airlines by the third quarter of 2020, including the deinstalls and the airline completing its shift to the airline-directed business model. As I said previously, 2019 is also benefitting from the deferral of some operating expenses into future periods. And some additional program spending will occur in 2020.

Finally, regarding cash flow. We're extremely pleased with the progress we've made in 2019. But do bear in mind that these results reflect a meaningful portion of the cash flow improvements we have targeted to come from working capital, which are largely nonrecurring.

As I conclude my prepared remarks, I want to join Oak in thanking our tremendously committed employees for their contribution to our strong financial results. I also want to add my thanks to our investors for this quarter.

Operator, we're now ready for our first question.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

### QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions) Our first question comes from Philip Cusick of JPMorgan.

---

**Philip A. Cusick** - *JP Morgan Chase & Co, Research Division - MD and Senior Analyst*

Two -- I guess first, congratulations on the deal to be signed today. Can you give us, Oak, an idea of the scale of that contract and what type of usage the customer envisions? Maybe what kind of competition did you see on that?

And then, Barry, you were just going through some of the issues in jumping off from 2019 EBITDA and free cash flow into 2020. Not to ask you for guidance yet for 2020, but maybe if you can give us some of the net impacts on both of those numbers, that would be helpful.

---

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Yes, Phil, Oakleigh first.

I don't want to get in front of the airways announcement, so I don't want to go too far. But I'll say that it's global route structure wide-body jets. We are -- the competition, where other IFC players that can offer global coverage, the usual suspects there. I think they are impressed with the quality of 2Ku; they flew it a lot on other airlines. And I would say it's an airline that's extremely focused on quality of service. So it's very rewarding to win that deal. It is both 2Ku as well as our IPTV product.

---

**Barry L. Rowan** - *Gogo Inc. - CFO & Executive VP*

And Phil, on your question about 2020 -- thanks for not pressing us for giving guidance on this call. As you know, we do that on our quarter four call, and we're still in the midst of budgeting for next year. But here are some things to think about.

So this year, there is that $9 million one-time benefit to adjusted EBITDA in 2019. As we look the next year -- the IBP savings are coming in ahead of plan. As we said coming into the year, we expect about half of those or a little more to be realized, half of the $75 million this year. And now it is more like two-thirds of the $50 million, so that certainly helps.

I would say on IBP, really most of the operational disciplines and process improvements are happening as planned. There's one project running behind plan that'll extend throughout 2020, having to do with driving efficiency and production operations. And we will look to be increasing some expenses for some important investment areas, 5G being the major one in BA. And that's on the order, on the OpEx side, of kind of $10 million to $15 million. And we'll also be doing things like adding to our really talented satellite team to meet the significant demand. And there may be some programs also that we would implement to take advantage of some new opportunities, things like line-fit and so on. So hopefully, that gives you a little more color on how we see 2020 unfolding.

---

**Operator**

Our next question comes from Lance Vitanza of Cowen.

---

**Lance William Vitanza** - *Cowen and Company, LLC, Research Division - MD & Cross-Cap Structure Analyst*

Nice job on the quarter.

10

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

On the Business Aviation segment, you obviously talked a lot about kind of rolling past the FAA ADS-B installation mandates. Those were a big deal in second quarter. I'm guessing that you didn't really see any impact of that in the third quarter, given the near record volume of shipments. But was that true? Or was there perhaps even some lingering impact in the beginning of the quarter, maybe? And I guess I'm just trying to think about what, if anything, that suggests for the next few quarters.

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Yes. No, there's still impact. In talking to the dealers, the big dealers in particular have handled all the larger aircraft at this point. There are more, I'd say, lower-value hauls that are still getting ADS-B. They've moved a lot of that out to what they call satellite facilities, so more remote airports where they have hangars, et cetera. And they've been able to open up shop floor space in their major facilities and get back to selling IFC and other product, which are frankly more profitable to them than ADS-B is.

So that said, there's still some pressure there. And I think we expect to see ADS-B installs continue through the first half of next year. I think the dealers expect that. So I don't think we're ever fully out of the woods on it. But it was nice to see it pick up in those orders. Remember, those aren't all activations; those are units that are shipped. And in the BA business, we sell them and then we book revenue. When we ship to the OEM or the dealer, they then actually install those. So some of those will go on the shelf and be installed over time.

**Barry L. Rowan** - *Gogo Inc. - CFO & Executive VP*

And just to add to Oak's point about the mix on OEM versus aftermarket, too, Lance -- I mean, the OEM has particularly picked up. And so where you see the impact of ADS-B is on the aftermarket side. So that's what we're -- still continue to see that during the course of the year.

**Lance William Vitanza** - *Cowen and Company, LLC, Research Division - MD & Cross-Cap Structure Analyst*

And then, if I could just ask a follow-up, again in the BA segment? But the monthly revenue for aircraft online on the ATG side for the last several quarters has been sort of stuck in the low single digit range. Is that just sort of what we should expect going forward? Or do you see an opportunity for reacceleration either under the current AVANCE L5 program or perhaps when you've eventually rolled out the 5G systems?

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Sorry, are you asking about ARPU in the ATG part?

**Lance William Vitanza** - *Cowen and Company, LLC, Research Division - MD & Cross-Cap Structure Analyst*

Yes.

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Well, there's a little bit of downward pressure there. But the people had unlimited -- a lot of people were buying unlimited plans when AVANCE first rolled out. And of course, when they go over certain thresholds, they would be getting charged more, et cetera, et cetera. So they've gone to more managed plans, I guess. So that's been little downward pressures holding it down. But you still see a lot of people upgrading plans as well.

We don't have 5G -- I don't want to get out and speculate too much about what our 5G pricing for plans will be. We haven't decided that yet.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

**Operator**

Our next question comes from Scott Searle of Roth Capital.

**Scott Wallace Searle** - *Roth Capital Partners, LLC, Research Division - MD & Senior Research Analyst*

Nice job on the quarter, guys.

Just a real quick question on Satcom capacity. I know you guys have been working hard to go back, renegotiate, expand the footprint to give you guys some diversity and reliability and backup in terms of satellite failures. But can you help us understand how some of those contract renegotiations get feathered into your Satcom costs, particularly on the international front, where utilization is a lot lower, just given the number of aircraft that are currently live?

And if you could extrapolate that, now with the new EMEA customer and 500 aircraft in backlog, does that get you to breakeven results in international once they're fully deployed?

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Well, let's start with the renewals. I mean, when we're renewing now, first of all, we're not using renewing on the same satellite. We're committing to a new satellite, like we did with EUTELSAT 10B, which was announced, I think, last week. And those new satellites are at a much lower unit cost than the contracts that are rolling off, dramatically lower. So those are improving our economics in Rest of World. And that's going to be one of the major drivers towards profitability in that division.

I'm sorry, the second part of your question on capacity was . . .?

**Scott Wallace Searle** - *Roth Capital Partners, LLC, Research Division - MD & Senior Research Analyst*

Well, Oak, just kind of extrapolating your backlog out in the Rest of World with 500 aircraft plus the new deal that's announced today -- as you start to get some better utilization with that footprint, and better costs, does that get you to breakeven just deploying against what [you've got] visibility and under contract to now in international markets?

**Barry L. Rowan** - *Gogo Inc. - CFO & Executive VP*

Yes, Scott, as we've said, and as Oak kind of reiterated on this call, the drivers remain what they've been, getting those installed, increasing the ARPU with new fleets [inaudible] as we do see some of the OEM costs coming down over time as we get those programs behind us and so on. Clearly, the increased demand being driven for satellite capacity helps worldwide, so just to underscore Oak's point on that.

And I would say that this order that we're announcing today certainly helps. And you also saw the announcement that we made about EUTELSAT for capacity over that region. So that also helps as current contracts come off and we're able to deploy that 10B satellite at attractive pricing. So I wouldn't want to say specifically about what that looks like for ROW losses. But clearly, this helps, and it's part of the strategy to add airlines in those regions where we have excess capacity and can drive it down and continue to drive the cost structure lower.

**Operator**

Our next question comes from Rick Prentiss of Raymond James.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

**Richard Hamilton Prentiss** - *Raymond James & Associates, Inc., Research Division - Head of Telecommunication Services Equity Research*

A couple questions, if I could. I want to follow up on some of Phil's questions, in particular to Satcom. If I wrote the numbers down fast enough, Barry, that you were giving, sounded like Satcom is down $20 million below plan year-to-date but that for the year it might be $15 million? Is that kind of the timing item you were getting at, or just increased demand?

---

**Barry L. Rowan** - *Gogo Inc. - CFO & Executive VP*

Yes, Rick, just to clarify that -- that $28 million year-to-date was the amount that we are under for Satcom as well as the department operating expenses. And then, for the year, we expect Satcom to be $15 million below the budget. And just as a reminder, it's growing, of course, on an absolute basis from second quarter, it grew in third quarter, will grow again in fourth quarter as demand grows. But even with that, growth in absolute terms, it's running below plan along the lines we talked about.

---

**Richard Hamilton Prentiss** - *Raymond James & Associates, Inc., Research Division - Head of Telecommunication Services Equity Research*

And as far as versus plan, is that your internal plan? Or is that kind of plan you would've communicated to the street? Is it doing like significantly better than the internal plan as well?

---

**Barry L. Rowan** - *Gogo Inc. - CFO & Executive VP*

No, that's versus the internal plan. And we've talked about the EBITDA exceeding expectations -- certainly is true versus the street, but it's also true based on our internal budget because of these expenses coming in below plan. And we talked about that on the last call, that part of that is due to the great work by the engineering team as we put policy management in place as we've introduced new network elements like modems that helps the overall usage to deliver the same user experience. So part of that has been the benefit of that kind of engineering work.

---

**Richard Hamilton Prentiss** - *Raymond James & Associates, Inc., Research Division - Head of Telecommunication Services Equity Research*

And back in the early prepared remarks, Oak, you might've mentioned something about a revenue hit in fourth quarter from a third-party character. Can you help us frame that, what kind of size you're talking about, which line item that would hit?

---

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Yes, it's a couple million. And I'll tell you it's [Ipass], which is -- it's pretty public the financial troubles that the parent company is in.

---

**Richard Hamilton Prentiss** - *Raymond James & Associates, Inc., Research Division - Head of Telecommunication Services Equity Research*

And last one for me. Obviously, it's up to Delta to make the announcement, but what kind of time frame should we be expecting updates from Delta, kind of on their view of unlimited WiFi? Is there a time line you can at least point us to to keep watching for?

---

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

No. I go down to Delta pretty regularly. And it's pretty well articulated to me that they prefer to make those announcements themselves. So we're going to [inaudible] their wishes. Our job is to support them operationally and let them manage the program commercially.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

**Richard Hamilton Prentiss** - *Raymond James & Associates, Inc., Research Division - Head of Telecommunication Services Equity Research*

And any final update on the MAX delays, how it affects your business? Looks like it's slipping out into 1Q, obviously. But just kind of help us update the thought of what MAX delays are meaning to not just installs but then also service revenues?

---

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Yes. I'll let Barry get to the service revenue component of it. I don't know that we really calculated it. We don't have a lot of MAXes. Like I said, there's 36 in backlog, which includes the seven that have already been installed. So we'd have presumably ARPA already from 36 more aircraft. And you can take an average ARPA number multiplied times that, and that would kind of be the hit on, I'm sure, MAX planes.

And then, of course, there are the planes that are not being given to us for installs. And kind of hard to quantify that exactly. We actually tried to for this call. Because when the airlines start delaying things, often there's a raft of reasons. MAX delays might be one of them, right? They're not going to get a MAX, so they need to keep some other plane in service and can't give it to us for a 2-day install.

So we can't really quantify that. But I would say there have been roughly 100 installs that got pushed out on us this year. MAX is probably 25%, 30% of those, something like that. That's what we sort of roughly estimate.

---

**Barry L. Rowan** - *Gogo Inc. - CFO & Executive VP*

And Rick, the revenue impact is really very small.

---

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

At least for now, for sure. And obviously, the MAX is a big part of our future. Once we are line-fit on that aircraft, that's an aircraft that will be -- there'll be a lot of those manufactured presumably, and it'll be one of the leading aircraft in the world in terms of unit counts. And so line-fit on that is very important.

---

**Operator**

Our next question comes from Louie DiPalma of William Blair.

---

**Louie DiPalma** - *William Blair & Company L.L.C., Research Division - Analyst*

Free cash flow generation has never really been associated with Gogo, and appropriately. You announced further measures to improve free cash flow on this earnings call, on top of this quarter's strong performance. Is the general plan to refinance your debt in June of 2021, assuming that you're still an independent company then?

---

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Yes, let me take those one at a time, Louie. First on the question about improvement to free cash flow. The drivers of that have been the increased EBITDA, the working capital management and the benefit from lower airborne equipment investment. What I tried to say is that we've had really an extraordinary improvement of free cash flow of $200 million or so in the first three quarters. That improvement over last year will decline as we exit the year for the reasons I mentioned. So we have an over $50 million interest payment in the fourth quarter, and we also expect there to be a use of cash from working capital in the fourth quarter. So that'll take the improvement year-over-year in free cash flow performance down from where it is year-to-date. But still, we feel very good about achieving at least $100 million improvement year-over-year.

14

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

**Barry L. Rowan** - *Gogo Inc. - CFO & Executive VP*

Regarding your question on refinancing -- yes, as you know, when we did the refinancing of the $925 million, we purposefully took a lower turn, and we could've taken a 5-year. So we did a 5-year term with a 2-year non-call period, with the understanding that that would enable us to refinance sooner. We expected at that time, and still do, for continuing improvement in the operations, and that even though we got a good improvement in the interest rate during the last refinancing, we expect to continue to be able to be in a position to refinance the balance sheet at more and more attractive rates.

So in terms of the timing, the next big event is the maturity of the 6% convertible notes, which is in May of 2022. So you could look to us getting something done with that in more than a year in advance of that is the way we think about that. So that puts you into getting something done by early 2021.

**Louie DiPalma** - *William Blair & Company L.L.C., Research Division - Analyst*

And now I have an extended, high-level industry question. Oak, I want you to address the topic of industry pricing power and negotiating leverage. It seems that when airlines had your ATG solution or no in-flight WiFi solution at all, it seems that the airlines had all of the pricing power. And that manifested itself with how the airlines, especially your largest partners, pressured you for heavy subsidies, which is why you accumulated over $1 billion of debt. Now that satellite antennae across the industry are now on over 8,000 planes, is there any evidence that airlines have switched a material number of planes from one Satcom antenna to another? And even if the Satcom solution is considered poor, is there any evidence of switching from one Satcom provider to another?

So whereas the airlines brutally exercised their pricing power over Gogo for the past decade, is it possible that all of the in-flight connectivity service providers have some degree of pricing power now when negotiating contract amendments, since they have a Satcom antenna that seems very difficult to switch off?

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

That was a rich and long question, Louie.

So I think in the early days, we would subsidize antennas heavily in order to win airlines in anticipation -- and those were usually turnkey deals, where we then had the commercial right on the aircraft to sell our product and to bring in third-party payers, et cetera. The world is obviously switching more to an airline-directed model, where the airlines want to control more of that, especially the large airlines. And so they're getting probably more sensitive on the -- well, they never had costs in the turnkey model, but they do have costs in the airline-directed model. Because they're the ones that are paying us for sessions or getting a sponsor to pay us.

So I think that there is less sensitivity on the equipment side. Most of our deals today are not heavily subsidized. Very few of our -- well, there are still some old deals that we're honoring that were somewhat subsidized a little bit. But there are new deals that are pretty much all at cost or very close to cost on the equipment. And then, I think the airlines are going more price sensitive on the sessions, and especially as they look at going free.

So we are very focused on driving our unit costs down, our Satcom unit costs down, and with 2Ku and other ways of delivering more efficient solutions to the airlines than our competitors can. So I think that might answer your question.

On the renewals, these contracts are long contracts generally. So there have been very few renewals. We did renew American Airlines earlier this year, because they have an unusually short contract with us. And we announced that, I think, on a quarter call. And they were, I'd say, a little bit less price-sensitive than they'd been in the past. But as I said, I think that service pricing is going to be where there's going to be competition going forward. That make sense, Barry?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

**Operator**

Our next question comes from Simon Flannery of Morgan Stanley.

**Landon Hoffman Park** - *Morgan Stanley, Research Division - Research Associate*

This is Landon Park on for Simon.

We're just wondering if you could expand on any other conversations you're having with your partners around offering free WiFi. And you also made some allusion to tightness in the continental U S. satellite supply market. So how should we think about your ability to meaningfully ramp your service offerings in North America, and when new supply might be coming online to support new services?

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Yes. Well, I think what I was alluding to was that Intelsat 29E, which had 9 3 gig of Ku on it but went out of service earlier in the year. So that took a fair amount of capacity out of the U.S. market.

But there's capacity for what we're trying to do. Right now, we are still in negotiation with a number of players. We got eight different suppliers we're working with. We're focused on getting the right pricing with them, and we're able to start a lot of competition between them. So we feel pretty good about that. So that's the capacity part of your question.

And what was the other part of your question?

**Landon Hoffman Park** - *Morgan Stanley, Research Division - Research Associate*

Any other conversations you're having with your partners around free WiFi, outside of Delta, of course?

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Yes. I mean, it's the conversation at every airline, of course. Some of them think it's great, and some of them are scared to death of it but feel that they may have to react. If one of the big majors goes free, what are they going to do? They're going to probably have to go free as well.

So I think free will sweep across the industry over the next, say, 5 years. Different airlines will do that differently. Lower-cost airlines are not going to give away high-quality sessions, probably. But they're probably going to give away something. And they will [have] everything in between. So yes, it's a major -- every airline's talking about it.

**Landon Hoffman Park** - *Morgan Stanley, Research Division - Research Associate*

And one last one -- CA-NA, the ARPA was modestly down year-over-year. How should we be thinking about that as we move into 2020 as we start to fully lap the American deinstalls?

**Barry L. Rowan** - *Gogo Inc. - CFO & Executive VP*

So as you look at this quarter versus last, Landon, this doesn't reflect the impact of American Airlines. Their full shift to the airline-directed model also in the second quarter did have a one-time benefit from the renegotiation of that contract that we talked about on the last call. As you look at

16

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 07, 2019 / 1:30PM, GOGO - Q3 2019 Gogo Inc Earnings Call

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Yes. I mean, I would just add to that that international wide-body fleets that are fully installed tend to have our highest ARPA numbers. But they are the hardest to install if they're traveling international routes. Because they're really utilized very heavily. And getting them out of service to install takes more time. So some of our great European brands we've been installing for 2 years or so. And we've still got time to go in order to get fully installed. And again, it's really because those aircraft spend so much time in the air that it's harder than with a domestic fleet, where we can [go] nose-to-tail and just bang in the antennas and churn them out. So it takes a little longer, but the reward is much better, the way I look at it.

**Operator**

Thank you. I would now like to turn the conference back over to Mr. Oakleigh Thorne for any closing remarks.

**Oakleigh B. Thorne** - *Gogo Inc. - President, CEO & Director*

Thank you. And thank you for attending our Q3 2019 Earnings Conference Call.

I'd like to leave you with a few thoughts. First, we have a very strong cash flow-generating business in BA. Not only does it have a unique competitive advantage by virtue of our spectrum ownership but it's also a relatively unpenetrated market and has ample runway for growth.

Second, Commercial Aviation Rest of World is growing. It's also an extremely large and unpenetrated market. And with our global 2Ku platform, our progress in line-fit and our strong backlog, we're well positioned to win our share of that attractive market.

Third, Commercial Aviation North America revenue is bottoming out as the impact of American Airlines deinstalls and their conversion to the airline-directed model is finally behind us. And we expect to start growing revenue again next year.

Fourth, we've strengthened our balance sheet, given ourselves strategic flexibility by pushing our senior notes out to 2024, and further strengthened our balance sheet this quarter by closing our $30 million ABL.

And finally, by virtue of our industry-leading market share and our asset-light operating model, we're well positioned to take advantage of the opportunities for this by the satellite industry. And we look forward to demonstrating that to you in the quarters to come.

Thanks again for your time. And look forward to talking to you again next quarter.

**Operator**

Thank you. Ladies and gentlemen, this concludes today's conference call. Thank you for participating. You may now disconnect.

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2019, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2019 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



# Exhibit D

Digitalizado
1 4 ABR. 2016

 **eutelsat**

MASTER SERVICES AGREEMENT NO. 053/15

Master Satellite Services Agreement ("Agreement" or "MSA") entered into as of this November 15, 2015 (the "Execution Date") by and between GOGO LLC (the "CLIENT"), and SATÉLITES MEXICANOS, S.A. DE C.V. ("EUTELSAT").

CLIENT'S INFORMATION: LEGAL REPRESENTATIVE: Tim Joyce – Vice President Engineer
ADDRESS: 111 N. Canal St., Chicago Illinois 60631 USA
NOTICES TO: Bhavini Desai – Manager TELEPHONE NUMBER: +1 (630) 647 1124 E-MAIL: bdesai@gogoair.com
BILLING CONTACT: Bhavini Desai – Legal TELEPHONE NUMBER: +1 (630) 647 1124 E-MAIL: bdesai@gogoair.com

EUTELSAT'S INFORMATION:
ADDRESS: Avenida Paseo de la Reforma 222, Torre de Oficinas, Piso 20, Colonia Juárez, Delegación Cuauhtémoc, C.P. 06600, Ciudad de México
NOTICES TO: Nora Gabriela Castillo Salazar – Sales Administration Manager TELEPHONE NUMBER: +52 (55) 2629 5840
E-MAIL: nora.castillo@eutelsat.com
BILLING CONTACT: Nallely Alejandra Rodriguez Díaz – Facturación TELEPHONE NUMBER: +52 (55) 2829 5800 ext.716
E-MAIL: nallely.rodriguez@eutelsat.com

EUTELSAT and the CLIENT, referred to herein irrespectively as a "Party" and jointly as the "Parties" hereby agree as follows:

## C L A U S E S

**FIRST.** Purpose. EUTELSAT, through its satellite fleet shall provide, as requested by CLIENT and/or any of its Related Entities, as such term is defined below, the following satellite capacity services categories: **permanent service** and/or **occasional service** and/or **integrated services.** Nothing contained in this MSA shall obligate EUTELSAT to provide, or CLIENT to accept, any service, unless both Parties have executed a Service Order for such service (each, a "Service"):

(i) Permanent Service, only includes uninterrupted satellite segment to be provided on a 24/7 basis for 30 or more calendar days;

(ii) Occasional Service includes the preemptible service to be provided for a minimum of 15 minutes per broadcasting. Occasional Services will be rendered, according to the applicable fees, booking them via Internet, through EUTELSAT's booking system using the personal and non-transferable access code provided by EUTELSAT, in accordance with the guidelines contained in **Exhibit 2.**

(iii) Integrated Service includes: (a) the provision of uninterrupted satellite segment, and (b) the transmission uplink and/or downlink equipment for the satellite signals (the "Equipment").

Notwithstanding the satellite capacity services' categories, EUTELSAT shall provide the Service or the Equipment subject to availability and according to CLIENT's requirements.

The CLIENT accepts and acknowledges that in case of any of its Related Entities request Services from EUTELSAT in accordance with this Agreement, it shall be provided that: (i) upon EUTELSAT'S written request, the relevant Related Entity demonstrates its relation with the CLIENT, in accordance with the term "Related Entities" set forth in this Agreement; (ii) the CLIENT will be responsible to EUTELSAT for any and all Services requested by its Related Entities; and (iii) for purposes of this Agreement the term "CLIENT" includes its Related Entities.

For purposes of this Agreement an "End User" means a third party in a customer or other legal relationship to CLIENT that is authorized by CLIENT to utilize all or part of the Service during the Term hereof.

CLIENT shall have the right to resell or to allot all or any part of the Service to its End Users, provided that CLIENT shall be solely liable for this resale, shall remain responsible for the compliance with all terms hereof, including all Exhibits hereto, of such End Users, and shall indemnify and hold harmless EUTELSAT for any claim, action or allegation made by any third party arising out of such resale.

**SECOND.** Exhibits. The Services will be rendered to CLIENT according to the terms and conditions herein provided, as well as the terms and conditions set forth in the applicable Exhibit to each Service. The Exhibits of this Agreement are the following:

i) Permanent Service
   a) **Exhibit 1** – Permanent Service Order

ii) Occasional Service
   a) **Exhibit 2** – Occasional Service Order
      "Procedure to Book Occasional Service"

iii) Integrated Service
   a) **Exhibit 3** – Integrated Service Order

Hereinafter such service orders will be jointly and generically referred to as "Service Orders" and, each will be identified with the name of the Service contracted.

According to the contracted Service, each Service Order duly executed by Parties shall set forth the technical specifications, term, price, and the particular applicable terms and conditions, which shall be governed by the terms of this Agreement.

In the event a conflict between this Agreement and the Service Order arises, the terms set forth in the Service Order will prevail over the Agreement.

**THIRD.** Services Orders, Confirmation and Renewal. During the term of this Agreement, the CLIENT with a valid executed MSA may request Services from EUTELSAT. If EUTELSAT has available capacity, and once the Parties agree on the Service, EUTELSAT shall prepare the corresponding Service Order to be subscribed between the Parties that shall govern the specific Service to be rendered and be attached to this agreement as its correspondent exhibit.

The Service Orders shall be amended by the Parties, in writing, whenever the CLIENT requests capacity increases and/or modifications to the contracted Service or new Services.

If CLIENT wishes to renew or extend a Service, the CLIENT shall provide written notice to EUTELSAT at least 45 calendar days prior to the Service termination date in order to reserve the requested satellite capacity. Upon EUTELSAT's receipt of the notice, as required above, EUTELSAT will negotiate in good faith



**⋙• eutelsat**

the new terms and conditions, including fees, that shall be set forth in the new Service Order.

If **CLIENT** fails to provide notice to renew or extend a Service, or if the Parties do not reach an agreement regarding the terms and conditions for the new Service within the 45 calendar days prior to the applicable Service termination date, **EUTELSAT**, without any liability whatsoever on its part and once the term of the corresponding Service Order has expired, may assign such satellite capacity to any third party by executing the corresponding agreement.

**FOURTH.** Use Restrictions & Replacement Capacity. No later than 10 calendar days prior to the commencement date of Service pursuant to a Service Order, **CLIENT** shall provide its "Transmission Plan" to **EUTELSAT** in order to operate **CLIENT's** network. **CLIENT** shall obtain **EUTELSAT's** prior written approval of its Transmission Plan as a condition to begin the Service, and **EUTELSAT** through electronic notice with acknowledgment of receipt to the Notice Contact set forth in the preamble of this Agreement, will assign **CLIENT** the satellite access frequencies and power to use the contracted bandwidth. Notwithstanding the foregoing, whether or not **CLIENT** has provided its Transmission Plan, for invoicing purposes, Service will be deemed to have started on the commencement date set forth in the corresponding Service Order.

**CLIENT** may modify its Transmission Plan from time to time during the term of the corresponding Service Order subject to **EUTELSAT's** prior written consent.

**EUTELSAT** may, in its sole discretion, replace the Service either on other transponders on the relevant satellite or on another satellite (the "Replacement Capacity") due to compelling operational reasons. In such event, unless otherwise specified in a specific Service Order, **EUTELSAT** shall provide **CLIENT** at least 48 hours (and longer if practicable under the circumstances, as determined by **EUTELSAT**) prior notice of such decision (the "Notice Period") and shall coordinate with **CLIENT** in good faith the transition of **CLIENT's** service hereunder to the Replacement Capacity. Subject to following paragraph, in the event **EUTELSAT** succeeds in replacing the Service in this manner, this Agreement shall remain in full force and effect and fully binding between the Parties until the expiration of the Term with respect to the Replacement Capacity, which shall thereafter be deemed to be the Service.

**CLIENT** may reject **EUTELSAT's** offer of Replacement Capacity on the relevant satellite or on another satellite by notice delivered to **EUTELSAT** prior to expiration of the Notice Period on the grounds that the characteristics of the Replacement Capacity deviate materially from the technical specifications. If **CLIENT** does not reject **EUTELSAT's** offer of Replacement Capacity in accordance with this provision, it will be deemed to have accepted such offer.

The Replacement Capacity may be considered to deviate materially from the technical specifications only if at least one of the following applies:

(a) the Replacement Capacity Equivalent Isotropic Radiated Power ("EIRP") is more than 2 dBW lower than the EIRP of the Service for more than 3 locations as indicated in the technical characteristics; or

(b) the Replacement Capacity Figure of Merit is more than 2 dB/K lower than the Figure of Merit of the Service as set forth in the technical specifications for more than 3 locations.

For the avoidance of doubt, if the Replacement Capacity does not cover the same area as the Service and therefore the Replacement Capacity Figure of Merit for a non-covered location is effectively zero that would be a material deviation for that location.

If **EUTELSAT** is unable or chooses not to offer **CLIENT** Replacement Capacity for any Service in accordance with this provision, all outstanding Service Orders using such Service shall terminate without further liability by **EUTELSAT** to **CLIENT**. In this event, **CLIENT's** liability to **EUTELSAT** shall not exceed payment for the Service provided prior to the failure of the satellite capacity. For purposes of this Agreement, **"Earth Station(s)"** means the antennas, switching facilities and related equipment that form a link between Eutelsat Space Segment and terrestrial networks. **"Eutelsat Space Segment"** means in-orbit satellites and all other related infrastructure owned, leased or operated by or on behalf of **EUTELSAT** to support the operation of its satellite fleet.

As a prerequisite for access to Eutelsat Space Segment, Customer must apply for and receive written approval from Eutelsat for each Earth Station model which is not owned and operated by **EUTELSAT** or any of its Affiliates must be approved in writing by **EUTELSAT** and must be in conformity with the technical requirements of the relevant **EUTELSAT** Earth Station Standard(s) ("EESS") and the **EUTELSAT** Systems Operational Guide ("ESOG"). These documents (as amended from time to time) are freely available to **CLIENT** upon request. **EUTELSAT** will provide advance notice of any changes to the EESS or ESOG. **EUTELSAT** will make reasonable efforts to notify **CLIENT** of revisions to the EESS or ESOG and will provide a copy or otherwise make such changes available to the **CLIENT**. Amendments to these documents which have a materially adverse impact on **CLIENT** may be a basis for **CLIENT's** termination of this Agreement and any Service Orders.

**CLIENT's** designated technicians are responsible for the operation of the Earth Stations of its satellite network and shall observe at all times that the Earth Stations do not exceed the nominal satellite access parameters assigned to each carrier, in accordance with each Service Order. When detecting an excess, **EUTELSAT's** personnel at Communications Control Center (CCC), will immediately request to the **CLIENT's** designated technician in charge of the Earth Station or to the **CLIENT's** network's manager to follow **EUTELSAT's** directions for any adjustment or for terminating any transmission to the satellite. In the event **CLIENT** does not perform the necessary technical adjustments or does not deactivate the carriers that operate beyond the parameters, **EUTELSAT** will notify **CLIENT** in writing and **CLIENT** shall pay an amount equal to the applicable fee for the bandwidth and/or power in excess, within 5 business days from the date of receipt of the **EUTELSAT's** notice. Likewise, **CLIENT** shall pay documented damages against third parties, and, in its case, the economic compensations or Interruption Credits that **EUTELSAT** shall pay to any affected customers. The payment by **CLIENT** of such charges does not provide any kind of authorization to continue operating the Service beyond the assigned access parameters.

**CLIENT** agrees to supervise the operating status of its Earth Stations in order to ensure that they do not cause any harm to or interference with **CLIENT's** own signals, any satellite or related infrastructure of **EUTELSAT** or of any third party, like **EUTELSAT's** customers' signals. At any time, and during the term of this Agreement, at **EUTELSAT's** prior request, **CLIENT's**



**eutelsat**

Earth Stations will be subject to On-Off Testing when searching for sources of interference. These tests shall be performed at a mutually agreed time frame within 24 hours if **EUTELSAT's** request.

If any **CLIENT's** Earth Station produces interference to other signals during its operation, **CLIENT** shall cease its transmissions to the satellite until such interference is completely eliminated. If **CLIENT** does not suspend its interfering carriers on the satellite, **EUTELSAT** may suspend the Service immediately. **CLIENT** agrees and acknowledges to be solely responsible for any and all adjustments and repairs of interference from **CLIENT's** Earth Stations, and **EUTELSAT** technical support to **CLIENT** is limited to recommendations to restore the Services, provided that **CLIENT** shall supply any and all necessary information that may allow, in conjunction with **EUTELSAT's** CCC, to try to eliminate the interference. **CLIENT** shall be liable to **EUTELSAT** for any interference of the Service, any satellite or related infrastructure of **EUTELSAT** or other third party, like **EUTELSAT'** customers' signals caused by **CLIENT's** and/or its end users' acts or omissions derived from the Earth Stations by means of the Service is provided.

**FIFTH.** Technical Escalation List & Availability of the Satellite Capacity. **CLIENT** shall provide in writing to **EUTELSAT**, within 5 calendar days from the Execution Date, the name, title, telephone and fax numbers, and email addresses, of its designated technicians responsible of **CLIENT's** network. In the event of changes to this information, **CLIENT** shall notify such modification in writing within 5 calendar days after such change occurs.

The **CLIENT** shall have at least one designated technician available 24/7, to attend and solve any technical issue that may arise in connection with the Service or the **CLIENT's** Earth Stations.

The Service will meet the technical specifications. The satellite capacity is optimized for on-board transponder performance availability of 99.7% per year (the "Annual Availability Rate").

The Annual Availability Rate is not a communications link availability rate and does not take into account interruptions or deterioration of the supply of the satellite capacity resulting, directly or indirectly, from atmospheric or extra-atmospheric conditions (solar storms or flares, meteorites, etc.); preventive maintenance operations carried out after prior consultation of **CLIENT** and/or sun conjunctions causing earth station outages (lasting a few minutes per day during a maximum period of 3 to 5 days, generally occurring at the beginning of March and October).

**SIXTH.** Conditions for Use of the Service. Throughout the term of this Agreement and the Service Orders, the **CLIENT** must satisfy the following conditions, each of which is considered material to the effectiveness of this Agreement:

(a) procure and maintain all licenses, approvals, and authorizations required by applicable laws and regulations, in order to receive, lease, distribute, su-lease, resell, promote, use and provide Eutelsat Space Segment;

(b) comply in all material respects with all operational requirements of **EUTELSAT** set forth in the EESS, ESOG, and transmission plan, and ensure that the same are fully complied with by **CLIENT's** End Users;

(c) if applicable under paragraph (b) above, install, license, operate and maintain its own Earth Stations and/or terrestrial

facilities necessary to communicate to and from the relevant satellite;

(d) strictly comply with all technical specifications of the Service which are clearly marked as applicable to **CLIENT**; and

(e) provide written evidence of **CLIENT's** financial solvency promptly upon request by **EUTELSAT**, including, but not limited to, financial statements, accounts, or other similar documents.

**SEVENTH.** Interruption of Services. If a Service interruption occurs ("Interruption"), **EUTELSAT** agrees to provide **CLIENT** an Interruption Credit to be applied against future payments for the Service, as provided in the applicable Service Order.

The Interruption must be caused by on-board transponder underperformance, (failure to meet technical specifications applicable to the Service) and continue for at least 15 consecutive minutes, provided that an Interruption shall not be taken into account for periods during which maintenance, previously notified by **EUTELSAT** to **CLIENT**, is being performed under the Service Order(s). No Interruption Credit will be due if such Interruption is a result of, or attributable in whole or part to (i) the fault of **CLIENT** or any agent or End User of **CLIENT**; (ii) the failure or unavailability of satellites, transponders, facilities, services or equipment furnished to **CLIENT** other than by **EUTELSAT**; (iii) jamming which is not attributable to **EUTELSAT**, (iv) interference caused by another customer on the satellite, provided that **EUTELSAT** uses all reasonable efforts to cause such customer to terminate such interference, or by the operation of another satellite or if the cause or origin of such interference is not reasonably determinable despite commercially reasonable efforts by **EUTELSAT** to identify and rectify cause or origin of such interference, or (v) any Force Majeure Event as defined in **Clause Seventeenth** herein.

The length of the Interruption will be measured from the earlier of the time **EUTELSAT** is notified by **CLIENT** of the Interruption or **EUTELSAT** otherwise independently becomes aware of the Interruption. The Interruption will be deemed ended when the Service is restored to meeting the technical specifications and **EUTELSAT** has so notified **CLIENT**.

**CLIENT** shall be entitled to an Interruption Credit on its next invoice determined in accordance with the following formula:

Interruption Credit = (Number of recorded minutes of Interruption of Transponder/43,800) multiplied by the monthly consideration for the Service; all partial minutes of Interruption shall be rounded up to the next whole minute.

**EIGHTH.** Intellectual Property. Under any circumstance, **CLIENT** shall NOT construe this Agreement as an authorization to use the trademarks, patents, designs, inventions, copyrights, and/or other intellectual property rights of **EUTELSAT's** property or any of its affiliates and subsidiaries. In case **CLIENT** requires a license and /or other similar right to use such property rights, it shall request in writing **EUTELSAT's** authorization, and if it is approved, the Parties shall execute a separate licensing agreement.

**EUTELSAT** may terminate for cause this Agreement, without any further liability whatsoever, in case of breach of the provision described in this clause, without prejudice of any other legal action or provision that may apply for the breach of any intellectual and/or industrial property rights. **CLIENT** agrees and acknowledges that the breach or non-compliance of the provisions herein contained may be subject to the applicable laws





for industry secrets and/or confidential information, or any other that may apply.

**NINTH.** Consideration and Payment Terms. **CLIENT** shall pay **EUTELSAT** for the Services, the amounts established in each Service Order plus the corresponding taxes, in advance monthly payments, by wire transfer, at CLIENT's own expense, in U.S. dollars to the following account:

> Satélites Mexicanos, S.A. de C.V.
> Account number 400126079
> ABA #: 21000021
> JP Morgan Chase Bank N.A
> SWIFT: CHASUS33

The amounts due for the Services are payable as specified in this Agreement and in the corresponding Service Order.

**CLIENT** shall pay Occasional Services in accordance with the contracted satellite segment, the usage period of time, and the fees agreed by the Parties.

The due and payable amounts pursuant this Agreement and each Service Order, may be paid in U.S. dollars or in Mexican currency, applying the dollar vs. Mexican peso exchange rate for sale determined by the receiver bank at the payment date.

**CLIENT** shall pay at the latest thirty (30) days from the date of the corresponding invoice (the "Payment Due Date"). If the Payment Due Date is a non business day, **CLIENT** shall be entitled to pay the following business day. **EUTELSAT** may suspend performance of its obligation to provide the Service committed pursuant to any Service Order(s) if any payment in respect of consideration for the Service or any other payments due remains outstanding for more than two (2) months. Suspension shall be effective 10 work days after receipt by **CLIENT** of written notice requesting payment of such unpaid sums and shall cease on receipt of the sums due. When provision of the Service resumes, **EUTELSAT** shall promptly provide notification thereof. However, in the event that the period of suspension exceeds 30 days, this Agreement shall automatically be terminated with no formality required and all fault shall lie with **CLIENT**.

The consideration for the Services or any other payments due but balances unpaid after the Payment Due Date shall be subject to interest charges equal to LIBOR 3 months plus 8% per annum. In the event CLIENT's dispute of any invoiced amount is decided in favor of **CLIENT**, any interest assessed by **EUTELSAT** as a result of **CLIENT's** late payment of such disputed amounts shall promptly be refunded to **CLIENT**.

**EUTELSAT** will apply any **CLIENT** payment received first to the oldest overdue amount for the Services according to this Agreement and each Service Order.

**EUTELSAT** will issue the corresponding invoices for the Services, in accordance to the Service Orders, on a monthly basis. **EUTELSAT** will provide the electronic monthly invoice to the **CLIENT's** e-mail address stated herein for such purpose. The fee for partial months shall be apportioned according to the number of days for which CLIENT had access to the Services as a fraction of the number of days in that calendar month.

**CLIENT** shall notify **EUTELSAT** in writing of any dispute regarding an invoice 10 days before the Payment Due Date.

**TENTH.** Guarantee Deposit. **EUTELSAT** requires **CLIENT** to pay a deposit in order to guarantee the fulfillment of its obligations under this Agreement, for the amount agreed between the Parties in each Service Order. Such deposit shall be paid to the bank account described in **Clause Ninth** above.

The deposit shall be increased when **CLIENT's** payment obligations are also increased, within the following 10 business days from the date on which the obligations are amended. Likewise, in case that **CLIENT's** payment obligations decrease, **EUTELSAT** will apply the deposit's difference on **CLIENT's** benefit against the invoice following the decrease.

The **CLIENT** agrees and acknowledges that the deposit may be applied to any overdue amounts for any Service, without further formality or judicial intervention or declaration whatsoever. **CLIENT** shall hold **EUTELSAT** harmless for any liability derived from the application of the guarantee deposit as it is described on this paragraph, and shall release **EUTELSAT**, its subsidiaries, affiliates and/or representatives, agents, employees or associates from and against any and all claims, damages, liabilities, costs and expenses arising from such application. **EUTELSAT** shall provide **CLIENT** written notice informing about the application of the deposit. **CLIENT** shall replenish the guarantee deposit applied immediately upon notice pursuant this paragraph, and pay any outstanding amount. Failure to replenish the guarantee deposit and/or pay due amounts, will be a material breach, and entitle **EUTELSAT** to terminate for cause this Agreement.

**EUTELSAT** shall return any remaining of the guarantee deposit, upon notice pursuant **CLIENT's** written request, when all Services end and all debts of **CLIENT** are settled in a term not to exceed 30 days.

**ELEVENTH.** Taxes. The Parties agree that each Party shall pay any and all taxes applicable to such Party in connection with this Agreement, according to the legal ordinances in force in their respective countries. **CLIENT** accepts and acknowledges that any and all amounts invoiced by **EUTELSAT** for the Services will not include any tax; therefore, **CLIENT** shall pay all amounts due to **EUTELSAT** free and clear of any set-off, restriction, condition or deduction.

For purposes of this Agreement, **taxes** means, without limitation, any tax, fee, duty, assessment, withholding, excise, managerial taxes, sales, value-added, gross-receipt, transfer and similar taxes, imposts, and levies that may be asserted by any government or tax authority, within the residence country of each Party or in the countries where its signal is received or emitted, that are in force at the Execution Date or that may be established after the Execution Date but that any Party shall be obligated to pay.

**TWELFTH.** Term. The term of this Agreement shall be 12 months starting on its Execution Date and shall be automatically renewed for identical periods upon the same terms and conditions, unless either Party provides to the other Party written notice at least 90 days prior to the termination date, of its intention not to renew this Agreement. Notwithstanding the foregoing, the terms and conditions of this Agreement and the Service Orders will continue applying as long as they remain in effect.

**THIRTEENTH.** Early Termination. Either Party may terminate a Service Order at any time providing prior written notice to the other Party, in case a Satellite failure is confirmed by **EUTELSAT** and **EUTELSAT** does not restore the Service under the relevant Service Order within: (a) 15 calendar days from the failure date (except in case of a Force Majeure Event); or (b) in the event that a Force Majeure Event exceeds 30 consecutive days, (during which 30 day period, the Parties shall meet and negotiate, inter




eutelsat

alia, the conditions for the termination or modification of this Agreement.) **CLIENT** shall be entitled to terminate all affected Service Orders, without further liability by either Party.

**FOURTEENTH.** Termination for Cause. In the event of a breach by **CLIENT** of the terms of **Clauses Sixth, Ninth and Twenty Third**, **EUTELSAT** may terminate this Agreement by sending written notice to **CLIENT** citing the breach and providing **CLIENT** with a 30 day cure period. If **CLIENT** fails to cure the breach within this time-period, **EUTELSAT** shall inform **CLIENT** thereof in writing. The termination shall be effective upon receipt by **CLIENT** of such written notification.

In the event of a material breach by **EUTELSAT** of any of its undertakings hereunder, or in the event of the Service experiences one or more interruptions aggregating 400 minutes (the Parties acknowledging that **EUTELSAT** cannot measure an interruption less than 15 consecutive minutes) in any consecutive 30 day period ("Excess Outages"), **CLIENT** may terminate this Agreement by sending written notice to **EUTELSAT** citing such breach and providing **EUTELSAT** with a 30 day cure period. If **EUTELSAT** fails to cure the breach within this time period, **CLIENT** shall inform **EUTELSAT** thereof in writing. The termination shall be effective upon receipt by **EUTELSAT** of such written notification.

The right of each Party to terminate this Agreement shall be without prejudice to its right to seek legal redress for damages.

This Agreement may be terminated at any time by the mutual, written agreement of the Parties.

Upon the expiry, early termination or suspension of this Agreement, the **CLIENT** shall cease all transmissions and use of the satellite capacity under such Service Order and **EUTELSAT** may reassign such capacity to a third party, without further liability whatsoever.

In the event of non-compliance by **CLIENT**, in addition to continued collection of the consideration for the Services, liquidated damages equal to 2 times the pro rata daily consideration for the Service of the affected Service Order, subject always to a minimum of $1,500.00 dollars (One thousand five hundred dollars 00/100 United States of America legal currency), for each 24-hour period, or fraction thereof, during which **CLIENT** continues to use the Service after the expiry, early termination or suspension of this Agreement, payable on demand.

**FIFTEENTH.** Consequence of Termination. Upon the termination of this Agreement in accordance with **Clause Fourteenth**:

(ii) any Service Order(s) in effect between the Parties shall terminate;

(iii) the **CLIENT** shall no longer be entitled to place Service Orders;

(iv) **EUTELSAT** shall be released from its obligation hereunder to provide any satellite capacity to the **CLIENT**;

(v) for a termination under first paragraph of **Clause Fourteenth**, **CLIENT** shall remain obligated to pay to **EUTELSAT** by way of liquidated and ascertained damages up to the amount accepted by the Parties as being the genuine and ascertained net loss likely suffered by **EUTELSAT**, equal to the aggregate consideration of the Service remaining unpaid under all Service Orders as of the date of termination of the affected Service Orders, plus interest thereon until paid in full computed in accordance with **Clause Ninth** hereof, reduced by all revenues, if any, received by **EUTELSAT** (but not by any Affiliates of

**EUTELSAT**) from **EUTELSAT's** leasing of the terminated Service to a third party net of costs of re-leasing, provided, however, that under no circumstances will **EUTELSAT** be obligated to credit **CLIENT** for any consideration for the Service paid or due to **EUTELSAT** by or from **CLIENT** up to the date of termination; and

(vi) for a termination under second paragraph of **Clause Fourteenth** due to **EUTELSAT** failure to deliver Leased Capacity, **CLIENT** shall be obligated to pay **EUTELSAT** only for that Service actually delivered, net of all credits to which **CLIENT** may be entitled (and for avoidance of doubt, in the event of a breach by **EUTELSAT** of any of its material undertakings hereunder, **CLIENT** shall be entitled to the remedies under third paragraph of **Clause Fourteenth**, as limited by **Clause Sixteenth**).

**SIXTEENTH.** Liability. Taking into account the nature of the Services provided neither **EUTELSAT** nor any Affiliate of **EUTELSAT** shall be liable for any loss or damage (including those for direct, indirect, or consequential damages or other loss of revenue or business injury) sustained by **CLIENT** by reason of **EUTELSAT's** inability, despite its commercially reasonable efforts, to provide any Service, nor for any loss or damage(including those for direct, indirect or consequential damages or other loss of revenue or business injury) sustained by reason of any interruption in the availability of any such capacity or any degradation in the technical characteristics of any such capacity.

Sums which may be claimed by **CLIENT** to repair damages suffered as a result of a breach by **EUTELSAT** of its obligations to provide Service shall not exceed in the aggregate one month's of the consideration for the Service.

**CLIENT** shall keep **EUTELSAT** indemnified and shall discharge it from all liability with respect to any damage, loss, obligation or expense arising from any non-conformity with the rules and standards governing the use of any Earth Station operated in connection with the Eutelsat Space Segment capacity, where the Earth Station:

– is owned or controlled by **CLIENT**; and

permits the **CLIENT** to access the Eutelsat Space Segment capacity.

**EUTELSAT** may only be held liable for damages (other than the Interruption Credits) directly resulting from its breach of an obligation hereunder and arising out of an act that **EUTELSAT** has committed. Accordingly, **EUTELSAT** shall not be liable for any interruption or deterioration of the supply of the Service resulting, inter alia, from:

– failure, breakdown, loss or destruction of the concerned satellite for reasons not attributable to **EUTELSAT** or if the cause or origin thereof is unknown;

– failure, breakdown, malfunctioning, loss or destruction of the equipment and/or the software used for monitoring, maintaining or controlling the concerned satellite, if said failure, breakdown, malfunctioning, loss or destruction is not attributable to **EUTELSAT** or if the cause or origin thereof is unknown;

– interruption or deterioration of the supply of satellite capacity resulting, directly or indirectly, from atmospheric or extra-atmospheric conditions (solar storms or flares, meteorites, etc...);

– interruption or deterioration of the supply of satellite capacity resulting from the jamming, alteration, modification or



 eutelsat

modulation of the emission frequencies of the concerned satellite, if said interruption or deterioration is not attributable to **EUTELSAT** or if the cause or origin thereof is unknown.

**CLIENT** shall be liable to **EUTELSAT**, and shall indemnify and hold harmless **EUTELSAT** and/or any Affiliate of **EUTELSAT**, from any losses, damages, and expenses (including outside attorney's fees, court costs and, to the extent permitted by law, any fines and penalties) suffered by **EUTELSAT** and/or any Affiliate of **EUTELSAT** as a result of claims, actions, allegations or proceedings brought by an End User or any third party against **EUTELSAT** or any Affiliate of **EUTELSAT**, for loss or damage resulting from the operation of Earth Stations owned or controlled by **CLIENT** or an End User.

**CLIENT** shall be liable to **EUTELSAT**, and shall indemnify and hold harmless **EUTELSAT** and/or any Affiliate of **EUTELSAT** from any losses, damages and expenses (including outside attorney's fees, court costs and, to the extent permitted by law, any fines and penalties) suffered by **EUTELSAT** and/or any Affiliate of **EUTELSAT** as a result of claims, actions, allegations or procedures brought by an End User or any third party against **EUTELSAT** or any Affiliate of **EUTELSAT**, for acts or omissions of **CLIENT** resulting, directly or indirectly, in the degradation, interruption or corruption of any services, content or data transmitted via any telecommunications network.

Neither **EUTELSAT** nor any Affiliate of **EUTELSAT** shall be liable to **CLIENT** for any acts of an End User or any third parties, including, but not limited to, acts or omissions resulting, directly or indirectly, in the degradation, interruption or corruption of the content transmitted via any satellite capacity provided by **EUTELSAT**.

**CLIENT** shall be liable to **EUTELSAT**, and shall indemnify and hold harmless **EUTELSAT** and/or any Affiliate of **EUTELSAT** from any losses, damages and expenses (including outside attorney's fees) suffered by **EUTELSAT** and/or any Affiliate of **EUTELSAT** as a result of claims, actions, allegations or proceedings, including by a third party, based on an infringement or alleged infringement of intellectual property rights by **CLIENT** or End User and arising in connection with the provision of satellite capacity, so long as **EUTELSAT** is not determined to be the infringing party.

**CLIENT** undertakes not to transmit or broadcast, or cause to be transmitted or broadcasted, by means of any Service granted to it by **EUTELSAT** hereunder, any content which would be deemed to be a violation of international public order or the laws of the countries or territories to which such content is accessible. Neither **EUTELSAT** nor any Affiliate of **EUTELSAT** shall be liable to **CLIENT** for the content transmitted via any satellite capacity provided by **EUTELSAT**.

Any claim for indemnification hereunder shall be subject to the following conditions:

(a)  The indemnified Party shall have given prompt notice and reasonable information to the indemnifying Party such that the indemnifying Party may reasonably respond to such claim;

(b)  The indemnifying Party shall be entitled to select counsel, reasonably acceptable to the indemnified Party, and at the indemnifying Party's sole cost and expense;

(c)  The indemnifying Party shall have the right to the exclusive conduct of all negotiations, litigation, settlements and other proceedings arising from any such claim, provided however, that the indemnifying Party shall not make any settlement

which materially and negatively impacts the rights of the indemnified Party hereunder without the consent of the indemnified Party; and

(d)  The indemnified Party shall, at the indemnifying Party's sole cost and expense, render all assistance reasonably requested by the indemnifying Party in connection with any such negotiation, litigation, settlement or other proceeding.

For purposes of this Agreement, **"Affiliate"** means an entity that directly, or indirectly through one (1) or more intermediaries, controls, is controlled by, or is under common control with a Party; provided that for the purpose of the foregoing, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person or entity through the ownership of voting securities or otherwise.

**SEVENTEENTH.** Force Majeure. Neither Party shall be liable for any breach or delay to comply with its obligations under this Agreement, Service Orders and/or Exhibits, due to any act, event or cause beyond its reasonable control ("Force Majeure Event"). Force Majeure Events may include, among others, and without limitation: acts of God, acts of nature without interference of any human agency, war, insurrection, civil strife or acts of terrorism, or action or inaction of any government or competent authority.

Service interruption due to a permanent failure of the satellite shall be considered a Force Majeure Event.

If the Services are interrupted in whole or in part due to a Force Majeure Event, **CLIENT** shall not pay for the Service during the continuance of such Force Majeure Event; provided, however, that **CLIENT** shall remain liable for any outstanding payment obligation originated before the occurrence of such Force Majeure Event and, **EUTELSAT** will apply in the following invoice the debt amounts against the proportional interrupted time for the Service affected.

If due to a Force Majeure Event, **EUTELSAT** determines that restoration of the Service(s) within 60 uninterrupted calendar days is not reasonably achievable, either Party may terminate this Agreement and/or a Service Order upon written notice to the other Party, without further liability whatsoever on its part and without further formality or judicial intervention.

**EIGHTEENTH.** Notices. All notices to be given in connection to this Agreement must be in writing and delivered to the other Party at the contact details specified herein, either: (i) personally with the corresponding acknowledgement of receipt; (ii) by registered mail with acknowledgement of receipt; or (iii) by any electronic mean with acknowledgement of receipt.

Each Party will notify the other in writing using the notices contact information contained in the preamble of this Agreement of any modification in its relevant contact information, within the following 5 business days of such change.

**NINETEENTH.** Licenses and Permits. The **CLIENT** acknowledges and agrees that **EUTELSAT** shall only provide the Service in the countries where **EUTELSAT** has obtained the corresponding permits and/or licenses to operate.

**CLIENT** shall use and require its End Users to use any Service provided under this Agreement in compliance with any and all applicable laws, rules or regulations of any territory in which **CLIENT** or any of its End Users uses the same.

**CLIENT** shall secure all licenses and permissions, including but not limited to those required to uplink and/or downlink a signal

 

 eutelsat

from the satellite, in any jurisdiction in which Service is being utilized by CLIENT or its Earth Stations or its customers and/or End Users, as required by applicable law.

In case CLIENT uses the Service within Mexican territory, it represents and warrants that it has authorization, permit or concession to install and operate earth stations to transmit satellite signals in accordance with the provisions of the Federal Telecommunications and Radiobroadcasting Law ("Ley Federal de Telecomunicaciones y Radiodifusión").

If CLIENT wishes to use the Services or part of them within Brazilian or Argentinean territories, CLIENT accepts and acknowledges that shall give EUTELSAT at least 60 calendar days prior written notice, to inform the procedure that must be followed by both Parties before the corresponding authorities of such countries to operate within them. Once any and all procedures have been fulfilled, the Service will be provided in such countries, in accordance with the terms and conditions provided by local authorities.

TWENTIETH. Confidentiality. Each Party will use reasonable care to maintain the security and confidentiality of all information and documentation exchanged between them in connection with this Agreement and/or the Service ("Confidential Information"). The obligations contained in this Clause Twentieth shall survive the termination or expiration of this Agreement for a period of 3 years. Upon termination or expiration of this Agreement, the Parties shall each return to the other or, if requested by the disclosing Party, destroy all Confidential Information belonging to the other Party. Any destruction of documents must be confirmed in writing to the disclosing Party.

Except as set forth above, the Parties may disclose Confidential Information only with the prior written consent of the other Party. Notwithstanding the foregoing, CLIENT authorizes EUTELSAT to disclose the Confidential Information in case of: (i) compliance with any legal requirement, (ii) a change of control or financial restructure, (iii) any legal or financial audit process, or (iv) to notify a third party that CLIENT is EUTELSAT's customer.

TWENTY FIRST. Privacy Statement. In accordance with the applicable provisions set forth by the Mexican Federal Law for Personal Data Protection Held by Private Persons and its Regulations ("Ley Federal de Protección de Datos Personales en Posesión de los Particulares"), EUTELSAT will be responsible in the collection of personal data from CLIENT and/or the individuals who represent the CLIENT (for purposes of this clause term "CLIENT" includes such individuals), and also for the use and protection of such personal data (the "Personal Data").

The Parties agree EUTELSAT may use Personal Data for the following legitimate purposes: (i) to identify CLIENT's personnel acting as the primary contact for EUTELSAT; (ii) to provide the contracted Services, and/or related activities; (iii) to provide information about new services related to the Service; (iv) to comply with EUTELSAT' legal obligations; (v) to observe and evaluate the contracted Services, and (vi) to contact through postal mail, electronic mail or telephone, to share news about the contracted Services or new services.

The CLIENT agrees the Personal Data may be disclosed to Related Entities of EUTELSAT and to third parties in Mexico or other countries, but only for the reasons (i), (ii), and (iv) set forth above.

The CLIENT has the right to know what Personal Data EUTELSAT collected regarding it and to correct it if necessary. The Parties agree that any and all requirement will be in accordance with the EUTELSAT's Privacy Policy posted on the web page www.eutelsatamericas.com which sets up the applicable requirements and terms for each case. The Parties agree that EUTELSAT has the right to amend its Privacy Policy at any time, at its sole discretion, without previous notice. In the event of any amendment to the Privacy Policy, such changes will be posted on EUTELSAT's website, so the most recent version is always available.

EUTELSAT commits to CLIENT that its Personal Data will be protected under strict administrative, technical and physical security measures, which are implemented with the main purpose of protecting such Personal Data against damage, loss, alteration, destruction, or unauthorized use, access or treatment.

TWENTY SECOND. Assignment. EUTELSAT may assign its rights and obligations under this Agreement, in whole or in part, to any of its Related Entities, without CLIENT's prior approval, just by providing prior written notice to CLIENT.

For purposes of this Agreement, "Related Entities" shall mean any person, corporation, Limited Liability Stock Corporation, general partnership, stock corporation, joint venture, association, company, trust, or any other kind of organization, whether or not incorporated as a legal entity, hereinafter referred to as "Person", that controls, is controlled by, or is under the common control of a stockholder of the relevant Party. In this sense, "Control" means the direct or indirect ownership of more than fifty percent (50%) of the equity or the partnership interest representing the capital stock with voting right of any Person, and the authority of directing or controlling the management or policies of a Person, whether through equity or partnership interests, with voting right, through the Board of Directors by means of an agreement or any other manner.

TWENTY THIRD. Representations and Warranties. Each Party represents and warrants that as of the Execution Date of this Agreement and any Service Order: (a) it has the right, power and authority to enter into and fully perform its obligations hereunder; (b) has secured all necessary corporate authorizations and approvals to execute this Agreement or any Service Order; (c) this Agreement and any Service Order constitute legal, valid, and binding obligations on it; and (d) the fulfillment of its obligations hereunder will not constitute a material violation of any applicable law or contractual relationships.

Moreover, each Party shall be liable to the other, and shall indemnify and hold the other Party harmless from, any breach of its respective representations and warranties as set forth in this Agreement.

TWENTY FOURTH. Governing Law and Jurisdiction. This Agreement, and all Service Orders issued under it, shall be governed by the laws of the State of New York, United States of America, without regard to the conflict of law provisions thereof. The Parties shall submit to the jurisdiction of the Courts in the State of New York, United States of America, and such court shall have exclusive jurisdiction over all disputes pursuant to this Agreement either directly or indirectly, as well as all disputes due to the underlying commercial relationship between the Parties (whether based on contract, tort, or some other theory). The Parties herein irrevocably submit to the jurisdiction of that court and waive, to the fullest extent permitted by law, the right to

 



commence any such action or proceeding in any other court or venue, as well as any objection related to forum or venue that it may now or hereafter have, including that the laying of venue of any such action or proceeding is improper, or that such action or proceeding has been brought in an inconvenient forum.

**TWENTY FIFTH. Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by e-mail or other means of electronic transmission (to which a PDF copy is attached) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

This Agreement is signed on the Execution Date, and may be executed in counterparts, each of which will be deemed an original. All such counterparts together will constitute one and the same instrument.

By **CLIENT**
GOGO LLC.

Signature: _____
Name: Tim Joyce
Title: Vice President Engineer

By **EUTELSAT**
SATÉLITES MEXICANOS, S.A. DE C.V.

Signature: _____
Name: AU JBL HERNANDEZ
Title: LEGAL REPRESENTATIVE



 eutelsat

**EXHIBIT 1**
**PERMANENT SERVICE ORDER NO. 053/15-1.0**

| 1. CLIENT'S INFORMATION | | | |
|---|---|---|---|
| Name | Gogo, LLC. | | |
| Address | 111 N. Canal St., Chicago Illinois 60631 USA | City | Chicago |
| State | Illinois | Country | USA |

| 2. CLIENT'S CONTACT DETAILS | | | |
|---|---|---|---|
| NOTICES | | | |
| Name | Bhavini Desai | Title | Legal |
| Telephone | Office: +1 312 517 5124 Mobile: +1 630 251 5168 | E-mail | bdesai@gogoair.com |

| 3. SATELLITE SERVICE DETAILS | |
|---|---|
| Category of the Contracted Service | Permanent Service |
| Contracted Bandwidth (MHz): | 43.800 MHz |
| Satellite: | Eutelsat 117 West A ("E117WA") |
| Region: | Ku1/Ku2 |
| Band: | Ku |
| Service Commencement Date: | November 15, 2015 |
| Service Termination Date: | December 31, 2018 |

| 4. DESCRIPTION OF THE SERVICE | | | | | | |
|---|---|---|---|---|---|---|
| Bandwidth (MHz) | Region | Commencement Date | Termination Date | Fee per MHz USD | Monthly Fee USD | Total Amount USD |
| 18.000 | Ku2 | November 15, 2015 | February 29, 2016 | $2,200.00 | $39,600.00 | $139,920.00 |
| 18.000 | | March 1, 2016 | December 31, 2018 | $3,900.00 | $70,200.00 | $2,386,800.00 |
| 25.800 | Ku1 | November 15, 2015 | December 31, 2015 | $2,100.00 | $54,180.00 | $83,076.00 |
| 25.800 | | January 1, 2016 | December 31, 2018 | $3,000.00 | $77,400.00 | $2,786,400.00 |
| | | | | Total Amounts: | $147,600.00 | $5,396,196.00 |

5.  **CATEGORY OF SERVICE:**    Preemptible Service ___        Non Preemptible Service **X**

<u>Preemptible Service</u> means a service that may be requested at any time as it is intended to immediately support a protected service and even a non-preemptible service, considering that those services are a priority. In its standard operation, the transponder has back up amplifiers.

<u>Non-Preemptible Service</u> shall mean a service whose transponder has back-up amplifiers, subject to availability and is not interrupted to give priority to a protected service, but does not possess, in the event of interruption, with immediate protection in another transponder or satellite.

1.  **SPECIAL PROVISIONS:**

6.1  **GUARANTEE**

Notwithstanding the provisions set forth in **Section 10** of the MSA, the Parties agree that the **CLIENT** will not pay any amount as guarantee for the fulfillment of its obligations pursuant this Service Order.

 

 **eutelsat**

**EXHIBIT 1**
**PERMANENT SERVICE ORDER NO. 053/15-1.0**

**6.2  COUNTERPARTS**

This Service Order may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Service Order delivered by e-mail or other means of electronic transmission (to which a PDF copy is attached) shall be deemed to have the same legal effect as delivery of an original signed copy of this Service Order.

This Service Order is executed on November 15, 2015.

| By CLIENT<br>GOGO LLC. | By EUTELSAT<br>SATÉLITES MEXICANOS, S.A. DE C.V. |
|---|---|
| Signature: _____ | Signature: _____ |
| Name: Tim Joyce | Name: ANGEL HERNANDEZ |
| Title: Vice President Engineer | Title: LEGAL REPRESENTATIVE |



# Exhibit E

**AGREEMENT**

This Agreement (the "Agreement") is made and entered into this _____ day of _____, 2019 (the "Effective Date") by and between:

**EUTELSAT S.A.,** a French joint-stock company, registered with the Registry of Commerce of Paris under the number 422 551 176, whose registered office is located at 70, rue Balard, 75015 Paris, FRANCE,

(referred to as "*Eutelsat*")

**AND**

**GOGO,** a company incorporated under the laws of [••••••••••••], under the registration number [••••••••••••••••••], whose registered office is located at [••••••••••••••••], duly represented for the purposes hereof by [••••••••••••••••],[••••••••••••••••••],

(referred to as the "*Customer*")

Customer and Eutelsat may be collectively referred to herein as the "Parties," or individually as a "Party.

WHEREAS, Customer and Eutelsat have concluded on 26 September 2019 a binding Service Order subject to Board approval in respect of Ku Band satellite capacity on the future E10B satellite (the "Service Order");

WHEREAS, the E10B satellite project was approved by Eutelsat's Board on [          ];

WHEREAS, the Service Order was approved by the Customer Board on [          ];

WHEREAS, the Service Order shall be completed by further documentation to be negotiated between the Parties;

WHEREAS, Customer and Satmex, a subsidiary of Eutelsat, have concluded a Master Service Agreement ("MSA" attached hereto as Schedule 1);

WHEREAS, the Parties wish to incorporate by reference the MSA into this Agreement, as revised hereinafter;

**NOW, THEREFORE, IN CONSIDERATION OF THE FOREGOING AND THE TERMS AND CONDITIONS SET OUT HEREINAFTER, THE PARTIES HEREBY AGREE AS FOLLOWS:**

**ARTICLE 1 – SUBJECT- MATTER - INTEGRATION OF THE MSA**

1.1 The Parties hereby agree to the following terms and conditions for ordering satellite capacity and services.

1.2 Save as expressly set forth in Article 1.3, the Parties hereby agree to incorporate by reference all of the terms and conditions of the MSA, which are hereby entirely integrated herein and made an integral part hereof, PROVIDED EXPRESSLY THAT this Agreement shall not apply to any Occasional Use Services or Integrated Services (as said terms are defined in the MSA) and all

1

references to said terms and/or the exhibits of the MSA relating thereto are expressly excluded from the scope hereof.

1.3 The following provisions of the MSA are hereby replaced and superseded by the terms set forth below:

    a) <u>Clause Nine is hereby replaced by the following wording</u>:

<u>**"NINTH - SERVICE CHARGES AND PAYMENT TERMS**</u>

*The Service Charges payable by the Customer shall be defined in the Service Order.*

*Unless otherwise specified in the Service Order, invoices for Service Charges shall be issued by Eutelsat on a monthly basis in advance, i.e. 1 (one) month prior the commencement of the Service.*

*Invoices to be issued by Eutelsat shall be sent by fax, email, regular or overnight express mail to the Customer's address specified in the Service Order.*

*Service Charges shall be paid in full by the Customer, without offset, withholding, counterclaim, or deduction of any kind, in the currency specified in the Service Order and by wire transfer (all related costs being assumed by the Customer) to the account designated in the relevant invoice (referred to as the "Designated Account").*

*Unless otherwise specified in the Service Order, payment of Service Charges is due no later than 30 (thirty) days as from the date of the relevant invoice (referred to as the "Payment Due Date").*

*Payments are deemed to have been made on the day when the relevant sum is credited to the Designated Account.*

*In the event that any sum is not fully paid on the Payment Due Date, Eutelsat shall be entitled, subject to a prior 5 (five) day written notice, to:*

    - *implement any technical and/or operational measures to limit or interrupt the Service;*

    - *require the immediate payment of all sums invoiced for the Service already provided, even if said sums are not yet due under the relevant Service Order; and*

    - *require that the Customer pay a fixed indemnity for recovery costs equal to 5% of the overdue amount, with a minimum of 1,000 (one thousand) Euros for each payment breach.*

*In addition to the foregoing, any payment due from the Customer that is not received on the Payment Due Date shall bear interest per day of delay. Unless otherwise stipulated in the Service Order, late payment interest shall be applied as of the said date in accordance with the following formula:*

$$LPI = UA \times [12\% + EURIBOR \text{ (if Euros) or } LIBOR \text{ (if United States Dollars)}] \times ND/365$$

<u>*Where*</u>:

*"LPI" is the Late Payment Interest.*

*"UA" is the then-current unpaid amount of Service Charges.*

*"EURIBOR" is the then-current EURIBOR one-year rate as published by the European Central Bank.*

*"LIBOR" is the then-current USD LIBOR one-year rate as published by the British Bankers Association.*

*"ND" is the number of days after the Payment Due Date.*

*In addition to the foregoing, the Customer shall pay a debt recovery fee of 40 (forty) Euros.*

*The Service Charges and any other payments hereunder shall be paid to Eutelsat net, i.e. without deduction or withholding of any and all present or future taxes (including, inter alia, VAT or turnover taxes), duties, assessments, levies and any other charges of any nature whatsoever now or hereafter imposed, levied, collected, withheld, or assessed by, or on behalf of, any Governmental Authority, unless such withholding or deduction is required by law (referred to as the "Deducted Taxes"). If by operation of law or otherwise, Deducted Taxes are required to be deducted or withheld from any amount payable to Eutelsat under this Agreement, the Customer irrevocably undertakes to pay such additional amounts to Eutelsat in order that that the net amount actually received by Eutelsat shall be equal to the amount that Eutelsat would have received if Deducted Taxes had not been deducted or withheld from such payment."*

b) Clause Twelve is hereby replaced by the following wording:

***"TWELFTH - ENTRY INTO FORCE AND TERM***

*This Agreement shall enter into force on the Effective Date set out on the head page hereof and shall remain in full force and effect for an initial term of 3 (three) years (hereinafter referred to as the "Term"). Service Orders shall commence and continue for the Operational Period(s) specified therein. Service Orders shall survive the expiry or early termination of the Agreement. For the avoidance of doubt, upon the expiry or termination of this Agreement, the terms and conditions of this Agreement shall continue to apply to any Service Order concluded by Parties prior to the expiry of the Term, until the respective expiry or early termination of said Service Order(s)."*

c) <u>Clause Twenty One is hereby replaced by the following wording</u>:

*"TWENTY-FIRST – PERSONAL DATA*

*To the extent personal data are processed under this Agreement, the Parties undertake to comply with the then-applicable regulations governing the processing of personal data, inter alia, French Law no. 78-17 of 6 January 1978 on information technology, data filing and civil liberties as amended and, as from 25 May 2018, EU Regulation 2016/679 of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data."*

d) <u>Clause Twenty Four is completed by the following terms</u>:

*"**Waiver of Jury Trial**. Each party hereby irrevocably waives its rights to trial by jury in any Action or proceeding arising out of this Agreement, any Service Order and/or the transactions relating thereto."*

    e) Exhibit 1 is hereby replaced by Schedule 2 hereto.

**IN WITNESS WHEREOF** each of the Parties has duly executed this Agreement on the date specified above.

| For and on behalf of Eutelsat S.A. | For and on behalf of GoGo |
|---|---|
| | |
| **By:** | **By:** |
| **Title:** | **Title:** |
| **Date:** | **Date:** |

4

**SCHEDULE 2 – TEMPLATE SERVICE ORDER**

**Service Order Reference: _____**

**BETWEEN:**

**Eutelsat S.A.,** a French joint-stock company, registered with the Registry of Commerce of Paris under the number 422 551 176, whose registered office is located at 70, rue Balard, 75015 Paris, FRANCE,

(referred to as "*Eutelsat*")

**AND**

[●●●●●●●●●●●●●●], a company incorporated under the laws of [●●●●●●●●●●●●],under the registration number [●●●●●●●●●●●●●●●●●], whose registered office is located at [●●●●●●●●●●●●●●●], duly represented for the purposes hereof by [●●●●●●●●●●●●●●●],[●●●●●●●●●●●●●●●],

(referred to as the "*Customer*")

Eutelsat agrees to provide the Customer with the following Service, and the Customer agrees to procure the Service from Eutelsat, upon the terms and conditions set out in this Service Order read together the Agreement in force between the Parties ref. [●●●●●●●●●●●●●●●●] and all annexes hereto:

| | | |
|---|---|---|
| *Satellite* | | [●●●●●●●●●●●●] |
| *Transponder* | | [●●●●●●●●●●●●] |
| *Bandwidth ( in MHz or Mbps)* | | [●●●●●●●●●●●●] |
| *Service Priority* | | [●●●●●●●●●●●●] |
| *Ground Service* | | **Yes / No** |
| *Service Application* | | [●●●●●●●●●●●●] |
| *Operational Period* | *Service Commencement Date* | **dd/mm/yyyy** |
| | *Service End Date* | **dd/mm/yyyy** |

5

| *Service Charges per month (excluding VAT)* | [●●●●●●●●●●●●] |
|---|---|

The technical characteristics of the Service are described in the annex(es) attached hereto.

**Special Conditions (*if applicable*):** [●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●]

In the event any conflict or ambiguity, the terms of this Service Order shall prevail over those of the Agreement.

**IN WITNESS WHEREOF** each of the Parties has duly executed this Service Order on the date specified above.

| **For and on behalf of Eutelsat S.A.** | **For and on behalf of** [●●●●●●●●●●●●●●] |
|---|---|
| | |
| **By:** | **By:** [●●●●●●●●●●●●●●●●] |
| **Title:** | **Title:** [●●●●●●●●●●●●●●●●] |
| *Signature and company stamp* | *Signature and company stamp* |

# Exhibit F



January 19, 2021

Mr. Philippe Oliva
Chief Commercial Officer
Eutelsat
70 Rue Balard
75015 Paris, France

Re:  Term Sheet for Capacity on E10B

Dear Mr. Oliva,

As you may be aware, the sale of Gogo Commercial Aviation ("Gogo CA") to Intelsat closed in December of 2020, and the Gogo CA business is now known as Intelsat Inflight LLC.  Over the past month, Gogo CA and its new owners reviewed all commercial discussions-in-progress at the time of the closing, including a certain undated term sheet for the potential lease of capacity on E10B that was signed sometime in 2019 (the "Term Sheet").  We also reviewed the draft Frame Agreement and Service Order that you provided to representatives of Gogo CA, both which have a number of wholly inadequate terms as well as omissions of many other terms that would be prerequisites to any definitive agreement that Gogo CA would be willing to execute for capacity on E10B.

Please be advised that we do not intend to pursue a definitive agreement for capacity on E10B as described in the Term Sheet and believe that the many important gaps and absent terms in the Term Sheet would preclude any finding that the Term Sheet is an enforceable contract.  To the extent that Eutelsat is relying on or making expenditures based on the parties' discussions, the Term Sheet, or the proposed Frame Agreement and/or Service Order, we trust that such reliance and expenditures will cease promptly.

We are available to discuss if you would like to discuss the matter further.

Sincerely,

David Tolley
EVP and Chief Financial Officer